Martin LEACH, Plaintiff,

v.

FORD MOTOR COMPANY, Defendant.

No. 03–74625.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 16, 2004.

Thomas M. J. Hathaway, Brady, Hathaway, Detroit, MI, for Plaintiff.

Thomas G. Kienbaum, Robert B. Brown, Kienbaum, Opperwall, Birmingham, MI, for Defendant.

**OPINION AND ORDER (1) GRANTING PLAINTIFF MARTIN LEACH'S MOTION FOR INJUNCTIVE RELIEF (2) DENYING DEFENDANT FORD MOTOR COMPANY'S MOTION FOR INJUNCTIVE RELIEF**

BORMAN, District Judge.

Presently before the Court is Plaintiff's Motion for Injunctive and Declaratory Relief (Docket Entry 2). The Court held hearings on December 18–19, 2003. The Court heard the testimony of Plaintiff Martin Leach. Defendant introduced into evidence the depositions of David Thursfield, Dennis Ross, and John Walker. In addition, both parties introduced exhibits into evidence. Thereafter, the Court heard argument by both parties.

For the reasons stated below, the Court (1) grants Plaintiff Martin Leach's Motion for Preliminary Injunction, and (2) denies Defendant Ford Motor Company's Motion for Injunctive Relief.

## BACKGROUND:

In September, 1975, Plaintiff Martin Leach ("Leach") began working for Defendant Ford Motor Company ("Ford") through its subsidiary, Ford Motor Company Limited ("Ford of Britain"). (Leach Affidavit, Brief in Support of Plaintiff's Motion, Ex. 1, ¶ 3). That began a very successful career. In May, 2002, Leach was promoted to President and Chief Operating Officer ("COO") of Ford of Europe, and in return, he was required to sign a Ford Trade Secrets/Non–Compete Statement ("the Statement"). (*Id.*, ¶ 4). As consideration for his signature, Leach received a significant amount of restricted stock. (Transcript of Preliminary Injunction Hearing, December 18, 2003, Vol. I p. 34) (Hereinafter "TR. Vol. I").[1] The Statement provided:

> For a period of two years immediately following my voluntary termination, as an officer, director or employee of Ford Motor Company, I shall not, directly or indirectly, work for or associate with any business that competes in trade or commerce with Ford Motor Company; and

1. Volume I of the Leach transcript refers to the first day of Leach's testimony, December 18, 2003. Volume II refers to the second day of Leach's testimony, December 19, 2003.

Always to refrain from any direct or indirect use or disclosures (whether intentional, negligent or reckless) of any trade secret or confidential or proprietary information belonging to Ford Motor Company to any person or business, without regard to the nature of my termination; and,

To refrain from taking any action that will cause the termination or interference of existing business relationships between or among Ford Motor Company, Ford Motor Company employees, and any of their customers or suppliers for two years following my voluntary termination from Ford Motor Company.

(Brief in Support of Plaintiff's Motion, Ex. 2). The Statement does not prevent Leach from working for a competing business if he is involuntarily terminated by Ford. However, the Statement does require him, without regard to the nature of his termination, to refrain from any direct or indirect use or disclosures of Ford trade secrets, or confidential or proprietary information.

Leach testified that during the early part of 2003, he started to sense a "changing tide, a feeling against me," throughout Ford management. (TR. Vol. I, p. 47). This "changing tide" began with Leach's 2002 Management Performance Appraisal ("MPA"). (TR. Vol. I, p. 39). In a section of the MPA titled "Supervisor's Assessment of Overall Performance," Leach's immediate supervisor, David W. Thursfield, Executive Vice President, Ford International Operations and Global Purchasing, wrote the following:

Since Martin's appointment as President and COO of Ford Europe he has driven the organization to meet its commitments. Despite declining markets this lead to a 4th quarter profit of $147m. Martin is a driver and he has taken on the task of meeting the challenges generated by declining business results with steps to ensure delivery on the European Transformation Strategy—ETS 1.1. He has also been a major force on the work to review the business model for the Ford brands in Europe and more specific actions such as the European CD program.

(TR. Vol. I, Plaintiff's Ex. 2). Nevertheless, Leach was only given the middle rating, "achiever", not the highest rating, "top achiever."[2] (Id.). Leach testified that in the twenty-seven years he was with Ford, he achieved the highest "top achiever" rating "25 out of 27 times." (TR. Vol. I, p. 41). Leach testified that the "achiever" rating was "a bit of a slap in the face." (Id.).

In May, 2003, Leach was in the United States for a series of meetings. (TR. Vol. I, p. 42). At one meeting he met the new auditor, Bob Pawelski, who asked Leach a series of questions, including whether Leach had used company funds to pay for a personal vacation. (Id.). He said he had not. Leach testified that "[a]s the questioning went on, I developed a more and more of impression that it was more like an interrogation, asking questions of me." (Id.). At the end of the meeting, Pawelski questioned Leach about whether he had contacted a primary target of the Motorsport Audit. "In fact, they said that they had tapped telephones and there was a record of a call being made from my office." (TR. Vol. I, p. 43). Leach stated that he "thought that the process, the process integrity and the line of questioning ... was highly inappropriate." (Id.).

---

2. The MPA uses a three-tiered rating system: "improvement required", "achiever", and "top achiever".

Leach further testified that he had not made any such call.

On July 23, 2003, Leach had a meeting with Thursfield in Ford's European design center. Leach testified:

> [Thursfield] opened the meeting by saying, you're getting yourself into trouble. He started to talk about the amount of time that I spent on operations in the United Kingdom versus Germany, a reference that I was spending too much time in the U.K. and attributed that to the fact that my family had moved back to the U.K. I challenged him on that, and I don't think necessarily that what the facts will show, but I let it stand . . . and then he made reference to the audit conversation, and this really confirmed my worst fears. He said—and then the issue with the Motorsport audit which there was a phone call, and I said, what are you talking about? I told them about that, and he said, they don't believe you, and that really confirmed my suspicion that there was doubt in the system, and basically my integrity was being called into question. . .

(TR. Vol.I, pp. 48–49).

In the interim, on June 11, 2003, Leach received an e-mail from an executive recruiter, Eric Salmon. Leach called Salmon later that day; the two met in Paris on June 12, 2003. A series of meetings ensued, at which Leach met with top officials at Fiat.

On August 1, 2003, Fiat offered Leach the opportunity to work in Turin, Italy as its CEO. (Brief in Support of Plaintiff's Motion, Ex. 3). The offer was expressly subject to "Ford Motor Company and any subsidiary thereof (all being hereinafter referred to as 'Ford') explicitly acknowledging that your acceptance of this offer does not contravene any contractual obligation that you may have with Ford; and

you providing Fiat with evidence of such acknowledgment." (Id.).

On August 7, 2003, Leach attended a meeting that he had requested with Thursfield and John Walker, Ford Europe's Executive Director, Human Resources, International Operations and Global Purchasing. (Ford's Brief in Opposition, p. 2). A dispute exists as to the precise words spoken by Leach at the meeting. Leach testified that he spoke from a document he prepared specifically for the meeting. (TR. Vol.I, p. 71). The "talking points" document stated:

- Thanks for meeting. One of most difficult during life.
- Worked for Ford since 18 years old, 3/5 ths of total lifespan
- Given 100% commitment over nearly 28 years
- Have delivered success in multiple functions, 3 continents, 3 companies
- Have enjoyed tremendous education and support from colleagues and mentors including DWT/JW—thanks
- Several issues have combined to create an untenable situation—Leadership vacuum, avoidance of addressing fundamental business governance issues

  Lack of cohesion amongst top management inhibiting resolution of business issues

  Demeaning personal interrogation around Whitaker saga (MRL initiated audit!!!)

  Confirmation by DWT that ML's integrity is in question

  Senior management discussions about Europe without involvement, followed by:

  Senior management leaks regarding European situation

- As a result ML is disappointed and dissolusioned [sic] with FMC and has

lost faith in senior leadership but still holds FMC in high regard.

- Company actions mean that ML has no choice but to seek alternative employment
- ML therefore believes it is in the interest of both Ford and ML that a mutually acceptable separation is reached
- ML confirmed thru [sic] multiple legal advice non compete is not enforceable
- ML has no wish to create difficulties for FMC and wishes that FMC will ultimately succeed
- ML would like to understand FMC view on how to proceed but willing to commit to exit endorsement to FMC, appreciative note to employees etc (all to be agreed with FMC) and agreement not to throw FMC to the wolves

(TR. Vol. I, Plaintiff's Ex. 7). Leach testified that he did not resign at that meeting, but instead sought an amicable resolution of what he deemed an untenable situation at Ford—they were unhappy with him, and he was willing to leave if he could get Ford to waive the non-compete clause in the Statement. (TR. Vol. I p. 75). Thursfield's deposition, however, presents a different understanding of Leach's statement at the meeting:

> [H]e said that he was glad he came to see both of us and had some chat about it. Then he said, I'd like to talk to you guys about my position, and because of the situation developing here, I find myself in a difficult position. I've lost confidence in the senior management and leadership of the company, nothing to do with you, David, but others ... and he said there seems to be a lack of strategic direction he wasn't comfortable with, and he wasn't comfortable with the way

he was interviewed by the auditors and other issues of motor sport individual that was subsequently dismissed from the company and that he thought his integrity was being questioned and that consequently he was seeking an amicable separation, termination of his employment from the company.

> I asked him if his decision to leave the company was irrevocable. If it wasn't, then I would have talked to him and found more detail. But he said, yes, it was. He is not a stupid guy. He's quite smart. So once he made up his mind and denigrated, if you'd like, the direction the company is going in to the point he clearly wanted to leave the company and he said his mind was made up, it was an irrevocable decision, I said, Okay, but before you leave the office, remember, your decision is irrevocable. I will have to set the train in motion to talk to Bill and get backfills organized.

(Deposition of David W. Thursfield, December 9, 2003, pp. 97–98).

Neither party disputes that Leach told Thursfield and Walker that he had two job offers, one from an original equipment manufacturer (OEM), and one from a company outside the industry.[3] Leach testified that he said "I [don't] know what the process [is]. John Walker said, neither do I. We may want to think about it for 24 hours, and David said, I'll have to think about it." (TR. Vol.I, p. 74). Walker asked Leach several times if he was "sure about this." (*Id.*). Leach said that he was.

On August 7, 2003, Dennis E. Ross, Vice President—General Counsel of Ford, sent the following letter to Leach:

> As you are aware, on May 17, 2002 you signed a Trade Secrets/Non–Compete

---

**3.** Leach testified at the hearing that he had only one job offer—from Fiat, and that he was puffing, or posturing during these negotiations by stating that there were two offers.

agreement (the "Agreement") with the Ford Motor Company (the "Company", including as used herein, any Ford Motor Company affiliate) in return for which you received a significant amount of restricted Company stock. Under the express terms of the Agreement, you acknowledged that you were aware of, and, in the course of your employment, would continue to learn of, Company trade secrets and confidential or proprietary information, and that it would be unfair competition for you to work for or become associated with a business that competes with the Company. You further agreed that you would not, for a period of two years following a voluntary termination of your Company employment, work for or associate with any business that competes with the Company.

Please be informed that *if you terminate your employment with the Company,* you will remain subject to the full terms of the Agreement, including the prohibition on working for or associating with any business that competes with the Company. The Company will take all necessary steps to enforce the Agreement, including legal action to enjoin you from working for or associating with a competing business, and/or to recover financial damages for the harm to the Company that would inevitably occur if you become associated with or work for a competing business.

(Brief in Support of Plaintiff's Motion, Ex. 7)(emphasis added).

On August 8, 2003, Leach replied to Ross's August 7, 2003 letter:

Your letter is at odds with statements that are being made to me by others within the company to the effect that I have "resigned". As you correctly recognize, this is not the case. At my meeting yesterday with David Thursfield and John Walker, I indicated that, while recent events had led me to conclude that I had no choice but to seek alternative employment, I was looking first for mutual agreement on separation terms. You will appreciate that any unilateral action by Ford indicating that I have resigned or undermining my position whilst still employed would represent an unjustified dismissal of me.

(*Id.*, Ex. 6).

Thereafter, there was further correspondence [August 11, 22] between Leach and Ross adhering to their respective versions of what had transpired at the August 7th meeting.

On August 26, 2003, Ford filed a lawsuit against Leach in Bonn, Germany. (Brief in Support of Plaintiff's Motion, p. 7). The lawsuit had two principal components: Ford's request for an injunction precluding Leach from working for Fiat, and Ford's attempt to preclude Leach from entering into a contractual relationship with Fiat. (*Id.*).

On September 4, 2003, Leach sent a final letter to Sean McIlveen, Esq., Executive Director—Employee Affairs, of Ford of Britain:

Ford are asserting that I am bound by the non-compete clause contained in the statement signed by me on 17th May 2002, notwithstanding that covenant is conditional on my voluntary termination. It is abundantly clear that my termination was not voluntary. Without prejudice to the other points I have made in previous correspondence with regard to the enforceability of the non-compete clause, it is clearly not applicable under the present circumstances by reference to its own express terms. Ford are now aware that I have been offered the position of CEO of Fiat Auto. I understand that Ford have informed Fiat that they intend to enforce the non-compete

against me and, if need be, against Fiat. Please be advised that Ford's attempt to prevent me taking up valuable employment is unlawful and may result in my suffering very substantial loss and damage for which I will obviously hold Ford responsible.

(Brief in Support of Plaintiff's Motion, Ex. 5).

On September 12, 2003, Fiat informed Leach that, due to Ford's unwillingness to acknowledge that it would not enforce the non-compete clause in the Statement, Fiat would look elsewhere for its next CEO. (Brief in Support of Plaintiff's Motion, pp. 7–8). On October 7, 2003, Ford withdrew the injunction proceedings in Bonn, while still maintaining its pending case in chief. (*Id.*, p. 8).

On November 18, 2003, Leach filed the instant Motion and Brief for Injunctive and Declaratory Relief. The Complaint alleges: Count I, Request for Injunction and Declaratory Judgment; Count II, Tortious Interference With Business Expectancies. On December 3, 2003, Ford filed its Answer to Complaint, Affirmative Defenses and Counter–Complaint. The Counter–Complaint for Declaratory and Injunctive Relief contains two Counts: Count I, Violation of the Uniform Trade Secrets Act, M.C.L. § 445.1901, et seq.; Count II, Breach of Contract.

## ANALYSIS

### A. Standard

■ A preliminary injunction is an extraordinary and drastic remedy that should not be granted unless the movant, by a clear showing, carries a heavy burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997). To be entitled to a preliminary injunction, a plaintiff must show (1) a strong likelihood of success on the merits; (2) that he will suffer irrepara-

ble harm if the injunction is not issued; (3) that the impact on the public interest is slight; and (4) there is no possibility of substantial harm to others. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).

### B. Discussion

#### 1. Justiciable Controversy

■ A "controversy" must be one that is "appropriate for judicial determination." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937). The controversy "must be definite and concrete, touching the legal relations of parties having adverse legal interests." *Id.* at 240–41, 57 S.Ct. 461. "It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* at 241, 57 S.Ct. 461.

■ The Court finds that a justiciable controversy exists between Ford and Leach. This is not a situation where hypothetical facts exist and the Court is being asked to render an advisory opinion. There exists a real and substantial controversy between the parties as to whether Leach was fired or voluntarily resigned. Such a situation is within the purview of a justiciable controversy.

#### 2. Injunctive Relief

*a. Strong likelihood of success on the merits*

■ A significant issue in contention among the parties is whether Leach voluntarily resigned his position with Ford or whether he was terminated by Ford. A resignation must be voluntary, unconditional, and unambiguous. *See Schultz v. Oakland County*, 187 Mich.App. 96, 102–03, 466 N.W.2d 374 (1991). "To constitute

a resignation, it must be unconditional and with the intent to operate immediately as such." *Poland v. Glover*, 111 F.Supp. 675, 676 (W.D.N.Y.1953). "Loose and ambiguous language will not be regarded as sufficient to prove the resignation of a corporate officer, at least where the subsequent acts and declaration of the officer are inconsistent with any such contention." 2 FLETCHER, *Cyclopedia Corporations* § 350 (Perm. Ed.1990 Rev. Vol.). In Michigan, to be voluntary and effective, a resignation need not include any magic words. Instead, whether an employee has resigned is determined by considering the full circumstances and all the credible and competent evidence submitted by the parties. *See Blom v. Thermotron Corp.*, 139 Mich. App. 50, 54, 360 N.W.2d 172 (1984).

Examining the totality of the circumstances and all the evidence submitted by the parties, the Court finds that Leach has shown a strong likelihood of success on the merits of his claim for injunctive relief... that he did not voluntarily resign, but instead was fired by Ford.

The Court heard the following pertinent testimony from Plaintiff Leach:

1. That by August 7, 2003, he felt his position with Ford and his authority to do his job were being undermined by:

a. his 2002 performance review that did not give him the highest rating;

b. the audit challenge re: Motorsport activity;

c. the search of his phone records relating to allegations that he had tipped off the subject of an internal investigation

d. no positive reinforcement from Ford Chief Human Resources executive Joe Layman or his boss David Thursfield;

e. information in a Detroit News article leaking alleged conversations at a Ford high-level executive meeting—that Ford was unhappy with its European operations, and sending Thursfield to Europe to oversee him; and

f. that new Ford Chief Financial Officer John LeClair had met with him and said that he didn't believe Leach's forecasts—just throws them away, that LeClair didn't support the European plan, and that if Europe didn't improve, "heads will roll." (TR. Vol. II pp. 102–103)

2. That he would have been a fool to resign from Ford, because:

a. his job offer from Fiat provided that his acceptance of that offer not contravene any contractual obligation he had with Ford, and further that he had to provide Fiat with evidence of that acknowledgment. (TR. Vol. I pp. 68, 75); and

b. he would become unemployed, and also unemployable at any automobile OEM.

3. That his positing of a win-win situation—a mutually acceptable separation agreement—for Leach and Ford based on his leaving to go to Fiat is credible, since there was considerable evidence that Ford was unhappy with him, they could fill his slot, not pay him his salary, and he could pursue his chosen profession at a different OEM. (TR. Vol. II pp. 68–73). It had become an untenable situation for everybody. (TR. Vol. II p. 59).

4. That he never said he had resigned at the August 7th meeting. (TR. Vol. I p. 75).

5. That he continued working in his position as COO of Ford Europe, after the August 7th morning meeting; that he wasn't escorted off the premises, wasn't restricted as to his access to office, or computer, and continued to attend highest level Ford Europe meet-

ings on August 7th and 8th. (TR. Vol.I, pp. 76–77).

6. That he received a letter on August 8th, dated August 7th, from Ford General Counsel Dennis Ross that stated: "if you resign". (TR. Vol.I, p. 80).

7. That he did not recall using the phrase "I threw in the towel" in an Automobile Magazine article interview. (TR. Vol.I, p. 95).

8. That the quote in the same Automobile Magazine article "there was no point in carrying on", described his feelings about the actions against him by Ford, and that even though he felt he was being pushed out, he didn't want to engage in a public media battle against Ford. (TR. Vol.I, pp. 97–98).

9. That if Ford said that it would not release him from the non-compete, he would have continued his employment at Ford.

10. That he has been a "car guy" all his life, "that's my chosen profession, the love of my life", that he has never worked in any other business full time since joining Ford. (TR. Vol. II, p. 111).

The Court, having had the opportunity to listen to and observe Plaintiff as a witness over a two-day period finds Leach's testimony to be highly credible. Further, Leach's testimony is supported by logic and other evidence.

The logic: an individual does not abandon a hugely financially rewarding job in his profession of choice, to become unemployed.

The other evidence: Leach's testimony, that he did not resign, is supported by significant uncontradicted evidence. The August 7th letter from Ford General Counsel Dennis Ross to Plaintiff, written after communications to Ross from the highest Ford executives regarding the August 7th meeting, states "if you terminate your employment". This quoted phrase clearly supports Leach's contention that he did not resign at the meeting earlier on August 7th, and that the other two individuals at that meeting, Thursfield and Walker, well understood that he did not resign.

In addition, Leach's contention that he did not resign is strongly bolstered by the undisputed evidence that he was allowed to continue to work at Ford Europe after the meeting—August 7th and 8th. Both Leach and Thursfield testified that Leach, with Thursfield and others, went about his business of attending highest level meetings, which dealt with future styling, jobs, and financial forecasts. This scenario is squarely at odds with Ford's contention that Leach irrevocably resigned on August 7th. The Court finds that it would have been inherently incredible for a company, as security-conscious and sophisticated as Ford, to permit an executive who allegedly quit to join a competitor, to continue to have access to, and input on, matters allegedly of the highest confidential content.

The Court finds, further, that the undisputed fact that Ford continued to give Leach access to highest level planning meetings after they "understood" he resigned, undercuts Ford's counterclaim that it is serious about protecting its trade secrets, and/or that Leach's potential employment as a top executive at an OEM would necessarily violate the trade secrets clause of the Statement.

The Court finds Leach's testimony on the issues critical to this preliminary injunction to be highly credible, and concludes that the evidence overwhelmingly supports his claim that he did not resign at the August 7th meeting, but instead, was involuntarily terminated by Ford after that meeting.

On the other hand, the Court finds the testimony of David Thursfield to be internally inconsistent and thus, discounts the

testimony as less credible and convincing. David Thursfield testified in his deposition on December 9, 2003, in pertinent part:

1. That based on the August 7th meeting with Plaintiff and John Walker, he concluded that Leach had irrevocably quit the company. (TR. Thursfield Dep. pp. 89, 91, 95)

2. That after the August 7th meeting, he phoned Ford CEO Bill Ford and Ford President Nick Scheele, separately, to tell them that Plaintiff "had made up his mind to leave the company." "It was about 8:00, 8:30 in the morning over here [Detroit] I think." (*Id.* p. 96).

3. That Leach was "seeking an amicable separation, termination of his employment from the company." (*Id.* p. 98).

4. That he spoke to Ford Motor Company General Counsel Dennis Ross in the late afternoon on August 7th, and that Ross was aware of what Thursfield had already told the others at Ford. (*Id.* pp. 112, 116).

5. That after the August 7th meeting, Thursfield attended Ford business meetings that afternoon with Leach, dealing with Ford product strategy, and the next day, August 8th, they both attended a financial review meeting, and a sales and marketing team meeting. (*Id.* pp. 113–114).

6. That after the Thursday, August 7th morning meeting, he did not have Plaintiff escorted from the premises as a former employee, and did not preclude him from accessing the company computer and doing his normal job of attending the highest level meetings on Thursday and Friday. (*Id.* p. 115).

7. That after the meeting on August 7th, he told Plaintiff that he would be getting a letter from Dennis Ross. (*Id.* p. 117).

The Court concludes, having heard the testimony of Plaintiff Martin Leach and having read the deposition transcripts of David Thursfield, and Ford General Counsel Dennis Ross and John Walker, discussed *infra*, and having also reviewed the other submitted documents, that Leach did not resign.

The evidence before the Court impels the obvious finding that Thursfield or Walker telephoned Bill Ford, Nick Scheele, Joe Layman or Ross after the August 7th meeting, and informed one or more that Leach wanted to resign if the parties could mutually agree that the non-compete clause would not be enforced. This finding is supported by:

1. Leach's testimony which the Court finds credible on this issue—that he did not resign.

2. Ross' letter to Leach on August 7th stating, "if you terminate your employment . . . ."

3. The fact that Leach was permitted to attend Ford business meetings on August 7th and 8th, after the August 7th Thursfield/Walker early morning meeting.

4. The logic of the situation: It would have made no sense for Leach to quit, thereby activating the non-compete clause, whereby he would not have been able to gain employment from Fiat or any other OEM.

Ford Motor Company General Counsel Dennis Ross testified at his deposition on December 12, 2003, in pertinent part:

1. That he wrote the August 7th letter to Plaintiff Leach. (TR. Ross Dep., p. 19).

2. That he was personally involved in the drafting of the non-compete clause in the Statement. (*Id.* p. 25).

3. That Ford has not defined trade secrets, that he doesn't recall whether

Ford ever informed employees what definition of trade secret Ford would use, and that he does not have any documents reflecting Ford's definition of trade secrets. (*Id.* pp. 26–27).

4. That the Statement does not provide for any non-competition prohibition if there is an involuntary termination. (*Id.* p. 30).

The Court concludes, having heard the testimony of Martin Leach, and having read the deposition transcripts and reviewed the other submitted documents, that Ross wrote the letter on August 7th after having been apprised of the subject matter of the meeting, that the letter clearly indicates that Ross' understanding was that Leach had not irrevocably resigned, but merely that he was testing whether Ford would invoke the non-compete clause if he did resign. The Court further concludes that Ross' testimony establishes that Ford has no specific definition of trade secrets.

John R.M. Walker, testified at his deposition on December 9, 2003, in pertinent part:

1. That he took notes of the August 7th meeting with Leach and Thursfield. (TR. Walker Dep., p. 26).

2. That he concluded that Plaintiff had decided to resign. (*Id.* p. 34).

3. That Plaintiff never submitted any written resignation. (*Id.* p. 86).

The Court concludes, having heard the testimony of Martin Leach and having read the depositions, that although Walker testified that he concluded that Plaintiff had decided to resign, the Court does not find that testimony credible given Leach's testimony and the other evidence before the Court. The Court finds that Plaintiff Leach did not, in fact, resign.

First, the Court finds credible Leach's testimony that he never expressly told Thursfield and Walker that he was resigning. Second, Ross' letter to Leach the day after the meeting with Thursfield and Walker, based on input from the highest Ford executives, stating "if you terminate your employment," clearly supports the Court's conclusion that the communications from Thursfield and/or Walker to Ross and/or others in Dearborn about the meeting, were that Leach was considering resigning or wanted to resign if the non-compete would be waived by Ford. The Ross letter does not say, "since you have resigned/terminated your employment . . . ." Third, Leach's persistent post August 7th letters to Ross expressing that he had not in fact resigned his position, also support the Court's conclusion that he did not voluntarily resign. Fourth, there would have been no logic in Leach resigning; he would become unemployed, and unemployable in his chosen profession. The non-compete clause would have prevented his employment at Fiat, which would not hire him if that clause was not waived, in writing, by Ford. Indeed, it would have prevented his employment at any OEM for two years. Fifth, Thursfield's assertion that he would "treat" Leach's comments at the August 7, 2003 meeting as though Leach had resigned, indicates that Leach had not resigned at the August 7, 2003 meeting, but rather, that Thursfield had interpreted Leach's statements as a resignation. The Court does not find credible Thursfield's testimony in his deposition that Leach stated at the August 7th meeting that he was resigning from his position at Ford Europe. Sixth, the Court further concludes that Plaintiff Martin Leach did not voluntarily resign, effectively resign, or constructively resign. The Court finds that Plaintiff did not express an intention to resign, or take actions to demonstrate that he was relinquishing his position. *See Hammon v. DHL Airways,* 165 F.3d 441, 448 (6th Cir.

1999) (Applying Ohio law). Although Leach's testimony indicates that he saw an untenable situation for both sides, he always indicated an unwillingness to resign unless Ford waived the non-compete clause. Seventh, the fact that Leach was not escorted off the premises on August 7th after the meeting, but was permitted to continue working, and indeed attend high level meetings on the 7th and the 8th, strongly supports the conclusion that Leach did not voluntarily resign from his job at Ford on August 7, 2003, and further that Thursfield and Walker did not treat Leach's statements at the meeting as a resignation.

After considering all the testimony, depositions and legal precedent, the Court finds that Leach has shown a strong likelihood of success on the merits of his petition for a preliminary injunction, to wit, that he was involuntarily terminated by Ford.

### b. Irreparable harm to the Plaintiff

To establish irreparable harm, a party seeking preliminary injunctive relief must demonstrate that he is threatened by some injury for which there exists no adequate legal remedy such as monetary damages. *Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); *Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18,* 471 F.2d 872, 877 (6th Cir.1972).

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other collective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Sampson,* 415 U.S. at 90, 94 S.Ct. 937.

█ Ford argues that no irreparable harm exists in this case because Leach is presently employed, albeit temporarily, as a contractor at significant compensation, although much less than at Ford Europe or what it would have been at Fiat. By being so employed, Ford contends, Leach has effectively taken himself out of the job market. Ford also claims that Leach cannot establish that a job in the automotive industry would be available if an injunction was granted. Leach argues, on the other hand, that Ford's actions including public statements,[4] have rendered him unemployable in the industry in which he has spent his entire 27–year career.

The Court finds that Leach will suffer irreparable harm if an injunction is not issued. Ford's public pronouncement that it would seek legal action against Leach and any competitor that tried to hire him, has effectively rendered Leach unemployable in the automotive industry. There is no adequate remedy at law to compensate Leach for being eliminated from consideration for top-level automotive-industry management jobs as they become available. Indeed, even apart from the issue of comparable monetary compensation to his Ford Europe position, Leach testified that his career interest of choice has always been in the automobile manufacturing industry. The Court finds that Leach will suffer irreparable harm if the injunction is not issued because he will be unable to serve at a high-level position with an automotive OEM.

### c. The possibility of substantial harm to others, to wit, Ford

█ Ford's argument with regard to this factor is that "[u]nderlying Ford's pol-

---

**4.** A "high Ford executive" told the *Automotive News* that Leach was bound by a non-compete agreement. (Brief in Support of Plaintiff's Motion, p. 18)

icy of requiring its top executives to sign non-compete agreements as a condition of their employment is the legitimate business interest of preventing unfair competition through the unauthorized disclosure or use of its confidential and trade secret information." (Defendant's Brief in Opposition, p. 18). However, as the Court noted previously, this component of the Statement continues in effect. The Court does not conclude that Leach's employment by an OEM, *per se*, impels the conclusion that he is breaching his commitment to not disclose confidential or trade secret information. Indeed, if that were the case, Plaintiff would not be employable by any Ford competitor under any circumstances (i.e. whether he was voluntarily or involuntarily discharged). There would be no need for a non-compete clause.

Ford contends, in a counterclaim, that the "inevitable disclosure" of trade secrets doctrine, prevents Leach from joining a competing OEM, apparently even if he was terminated.[5]

Ford relies on *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262 (7th Cir.1995) in support of its argument. In *PepsiCo,* the plaintiff sought a preliminary injunction against Quaker Oats and plaintiff's former employee, who had signed a confidentiality agreement, to prevent him from divulging plaintiff's trade secrets or confidential information. The United States Court of Appeals for the Seventh Circuit, applying the Illinois Trade Secrets Act, stated that "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *Id.* at 1269. In *PepsiCo,*

the Seventh Circuit's decision to affirm the District Court's decision rested in significant part on the lower court's determination that the former employee's conduct evidenced a lack of candor, and proof of his willingness to misuse trade secrets. *Id.* at 1270. There is no such evidence before this Court in the instant case.

In *CMI International, Inc. v. Intermet International Corp.,* 251 Mich.App. 125, 132–33, 649 N.W.2d 808 (2002), the Michigan Court of Appeals discussed the "inevitable disclosure" theory. Specifically, the court noted the *PepsiCo* holding, and stated, in dicta, that "[e]ven assuming that the concept of 'threatened misappropriation' of trade secrets encompasses a concept of inevitable disclosure, that concept must not compromise the right of employees to change jobs." *Id.* at 133–34, 649 N.W.2d 808. The court held that "for a party to make a claim of threatened misappropriation, whether under a theory of inevitable disclosure or otherwise, the party must establish more than the existence of generalized trade secrets and a competitor's employment of the party's former employee who has knowledge of trade secrets." *Id.* at 134, 649 N.W.2d 808. Thus, *CMI International, Inc.* involved a gratuitous discussion of the doctrine in dicta. Based on the facts before this Court at this time, the Court rejects the application of the "inevitable disclosure" theory.

The Court distinguishes this non-competition clause scenario from a case cited by Defendant, *Neveux v. Webcraft Technologies,* 921 F.Supp. 1568 (E.D.Mich.1996). In *Neveux,* the two year non-competition agreement applied, regardless of whether the Plaintiff quit or was fired.

---

**5.** Ford's Brief in opposition to Plaintiff's Motion for Injunctive and Declaratory Relief states at pp. 5–6:

Ford has counterclaimed pursuant to the Uniform Trade Secrets Act, Mich. Comp.

Laws § 445, 1901, et. seq. ("USCA"), and the incorporated doctrine of a inevitable disclosure of trade secrets.

As to United States District Judge Patrick Duggan's contention, that a plaintiff must satisfy an even heavier burden of proof where he seeks a preliminary injunction to alter the status quo to receive the relief to which he would be entitled after a successful trial on the merits, this Court concludes that the evidence in this case overwhelmingly establishes a strong likelihood of success on the merits and the other three factors required to support the issuance of this preliminary injunction. Plaintiff Leach has clearly met any such heavier burden of proof.

The Court notes that Ford conditioned Leach's promotion to COO on Leach's signing of the Statement. Although Leach expressed "concerns" over the Statement, Ford stated that it would not publicize his promotion until he signed the Statement. (TR. Vol.I, p. 36). Ford drafted the Statement and enforced Leach's adoption of the Statement. Ford must now live with the Statement, which does not restrict Leach from seeking employment in the automotive industry after being terminated. The Court notes the continued viability of that portion of the Statement requiring Leach to refrain from any direct or indirect disclosure of any trade secret or proprietary information.

David Thursfield's actions, in not escorting Leach off the premises after Thursfield assumed Leach had resigned, but instead, for August 7th and 8th allowing Leach to further access his office/computer and even more significant, attend highest level planning/financial sales meetings indicate that Ford either did not term that information confidential trade secrets, and/or did not feel that Martin Leach would improperly use his knowledge of that information to Ford's detriment. This significantly undermines Ford's claim of substantial harm if the Court grants Leach's motion for a preliminary injunction to prevent Ford's enforcement of the two year non-compete provision of the Statement.

The Court concludes that based on the facts presented, there is not a danger or irreparable harm to Ford if the injunction is granted.

### d. The impact on the public interest

■■ It is the public policy of Michigan as embodied by statute to enforce reasonable non-competition provisions in employment contracts. M.C.L. § 445.774a(1). The non-competition provision in the instant Statement applies to a Ford employee who voluntarily resigns from his employment. The evidence before the Court strongly establishes that Leach did not voluntarily resign from Ford. The instant non-competition provision does not apply where an individual is terminated by his employer. Accordingly, the Court finds that the public interest favors the issuance of an injunction to prevent Ford from enforcing the non-compete clause against Leach because he did not voluntarily resign, a condition precedent to the enforcement of that clause.

### CONCLUSION

■ Accordingly, the Court finds, based on overwhelming evidence, that Plaintiff Martin Leach was terminated involuntarily by Ford, and grants Plaintiff Leach's request for a preliminary injunction preventing Defendant Ford from enforcing the two year non-compete clause that applies only to a voluntary termination of employment. The Court concludes that the evidence does not support Defendant Ford Motor's request for a preliminary injunction.

The Court enjoins Defendant Ford Motor Company from:

1. Making any further effort to enforce the non-competition clause of the

Trade Secrets/Non–Compete Statement, asserting any right to prevent Martin Leach from engaging in employment with a competitor, or otherwise attempting to prevent Martin Leach from seeking, accepting or undertaking employment with any direct or indirect competitor of the Ford Motor Company;

2. Making any public or private statement claiming that Martin Leach is bound by a non-competition agreement, or claiming that Martin Leach is otherwise legally precluded from accepting employment or associating with any competitor of the Ford Motor Company.

**SO ORDERED.**