**Robyn J. LAWRY and Frying Pan Anglers, Inc., Plaintiffs–Appellees and Cross–Appellants,**

v.

**Roy C. PALM, Defendant–Appellant and Cross–Appellee.**

No. 07CA0334.

Colorado Court of Appeals,
Div. V.

July 24, 2008.

552

Leavenworth & Karp, P.C., James F. Fosnaught, Glenwood Springs, Colorado, for Plaintiffs–Appellees and Cross–Appellants.

Austin, Pierce & Smith, P.C., Thomas Fenton Smith, Daniel J. Sullivan, Aspen, Colorado, for Defendant–Appellant and Cross–Appellee.

Opinion by Judge GRAHAM.

Defendant, Roy C. Palm, appeals the judgment entered after a trial to the court in favor of plaintiffs, Robyn J. Lawry and Frying Pan Anglers, Inc. (FPA), for breach of contract and conversion. Plaintiffs cross-appeal portions of the trial court's judgment finding that no confidential relationship existed between the parties, awarding damages to defendant on his counterclaim, declining to award pretrial interest on FPA's conversion claim, declining to award attorney fees as consequential damages, and declining to award attorney fees to FPA as the prevailing party. Plaintiffs also cross-appeal the trial court's order denying Lawry's request for costs pursuant to section 13–17–202, C.R.S. 2007. We affirm.

FPA is a fly fishing retailer and licensed outfitter located in Basalt, Colorado. FPA provides fly fishing guide services on the Frying Pan River and float and guiding services on the Roaring Fork and Colorado Rivers. Defendant was the sole owner of the capital stock of FPA and operated the business for approximately twenty years. He also individually held United States Forest Service Permit SOP89, an outfitting license that was necessary for commercial guiding on the Frying Pan River.

On December 23, 2003, defendant and Lawry entered into an agreement whereby defendant would sell to Lawry all his capital stock in FPA for the sum of $150,000, to be paid over an eighteen-month period. In addition, the agreement contained an employment agreement whereby defendant would continue working as a consultant to FPA for ten years in exchange for an annual salary of $36,000. The employment portion of the agreement required defendant to hold "the Outfitting Licenses absolutely [for] the benefit of" FPA, because the "continued holding and availability of these licenses is integral to the ongoing viability of" FPA. This provision was included in the agreement in response to defendant's representations to Lawry that the permits and licenses could only be held in defendant's name and could not be transferred to FPA.

On April 1, 2004, defendant transferred and conveyed all FPA shares of stock to Lawry. As of November 22, 2004, Lawry had paid defendant $76,671.23 and $73,328.77 remained due on the purchase price.

On November 23, 2004, the parties' deteriorating relationship took a turn for the worse. Defendant submitted an order for trout flies to Mowbray, Lawry's husband and FPA's vice president. Mowbray responded in an e-mail to defendant, stating that the fly order appeared to be excessive. Defendant e-mailed a reply: "You are on your own." Without receiving a response from Mowbray or Lawry, defendant sent another e-mail later that day, providing in part:

I have been ordering flies from various manufacturers for twenty years and I know I have a better understanding of flies than you. Look at the facts—Flies have been our largest sales for years.

I am not stupid! The reputation of ... [FPA] has been going down since you took over. I worked twenty years to make the shop what it was and you have been running it into the ground. This is not just me talking but customers who Art [a]nd I have known for years. You lost Scott Rods, are losing Sims and Action Optics. You have been selling off the inventory that came with the shop (that I paid for) in order to keep the doors open. The shop had the best year ever and should be paying for itself. So much for "nothing is going to change[.]" Don't cut off your nose to spite your face. The reason for the increase in sales was not of your doing, but location, location, location! I was more

than willing to be part of the team but there is not a team. It's all you and when you don't listen to experience and people who are trying to help, then I don't know what to do. I would like my name, web fishing reports, and any reference to or about me removed from ... [FPA]. I want real property as equity as insurance per our agreement. (not encumbered). The shop has been working on my credit long enough. Use your own credit. I don't think you want me calling the INS.

Lawry assumed that defendant had resigned from FPA, and the next day, plaintiffs' attorney sent defendant a letter explaining that Lawry "accepted" defendant's "desires" that were "expressed" in his e-mails, that she was negotiating with the bank to obtain a loan to pay the balance owed to him, and that she was ready "to work with" his attorney "to settle all matters of disassociation." Defendant did not respond to the letter.

On December 3, defendant sent Lawry the following e-mail:

I would appreciate it if you would drop my 2003 and 2004 credit card invoices off at my mailbox or the shop. I would also like to have my 2003 income tax information. [Anything] that is yours and pertains to ... [FPA] will be delivered to you at the shop. Year being 2004. Give me a list.

That same day, plaintiffs' attorney sent a letter to defendant requesting FPA's 2003 tax return so that Lawry could secure a loan to pay the balance owed to defendant. The letter also discussed "winding up" FPA's affairs and "orderly disassociation." Defendant did not respond to the letter.

On December 9, the parties' attorneys met and discussed "winding up" FPA's affairs. Defendant's attorney did not indicate that defendant wanted to continue working for FPA.

Rather, on that same day, defendant removed from FPA's fly shop Permit SOP89, which had been amended to include a second permit, the "Grizzly Permit," which authorized guide trips on the Colorado River and had been purchased by FPA in 2004. Defendant notified the Colorado Department of Wildlife that FPA could no longer operate under "his" permits. He also informed FPA's guides that he was no longer an FPA outfitter, that they could not take float trips under his permits, and that they could not go on United States Forest Service property because FPA no longer had the use of "his" permits.

From the time defendant removed the permits until May 2005, FPA had no permits and, therefore, FPA guides could not take customers on guided fishing trips. As a result, many of the guides resigned and FPA was unable to replace them.

Plaintiffs then filed this complaint against defendant, alleging that defendant (1) breached the agreement by resigning from FPA, withdrawing the permits from FPA, and failing to perform certain duties under the agreement; and (2) converted a truck, a computer, and the Grizzly Permit, which were all owned by FPA. Plaintiffs also asserted claims for interference with business relationships, defamation, breach of fiduciary duty, fraud, and civil theft.

Defendant answered and filed counterclaims for breaches of contract, alleging that plaintiffs wrongfully terminated his employment, that Lawry failed to pay him the entire $150,000 purchase price for FPA, and that plaintiffs had interfered with his ability to perform his duties under the agreement.

After a bench trial, the court found in favor of plaintiffs on their breach of contract and conversion claims and against them on all remaining claims. On the breach of contract claim, the trial court awarded damages for the time Lawry "spent dealing with the consequences of [defendant's] breaches" in the amount of $2,625, lost license fees in the amount of $90, and FPA's actual and future lost profits in the amount of $63,549, plus interest in the amount of $9,089. In addition, the trial court imposed a constructive trust on Permit SOP89 and ordered defendant to convey that permit to FPA within three days and to execute a form "naming FPA as the new holder applicant." The trial court awarded plaintiffs $11,400 for the conversion of the truck and $500 for the conversion of the computer, plus pretrial interest. The court ordered that the Grizzly Permit "shall

be transferred to Plaintiff by execution by [defendant] of Form FS–2700–sa Holder Initiated Revocation of Existing Authorization."

The trial court ruled in favor of defendant on his counterclaim for breach of contract and awarded him the balance due on the purchase price, $73,328.77, plus pretrial interest, pursuant to "Section 5 of the Agreement." The court denied defendant's remaining counterclaims.

The trial court declined to award any party attorney fees as the prevailing party and denied plaintiffs' request for Lawry's costs pursuant to section 13–17–202.

This appeal followed.

## I. Standard of Review

■ This is an appeal from a judgment entered after a trial to the court. We, therefore, review the court's judgment here as a mixed question of fact and law.

■ We defer to the court's credibility determinations and will disturb its findings of fact only if they are clearly erroneous and not supported by the record. *M.D.C./Wood, Inc. v. Mortimer,* 866 P.2d 1380, 1383 (Colo. 1994); *Page v. Clark,* 197 Colo. 306, 313, 592 P.2d 792, 796 (1979). When the evidence is conflicting, a reviewing court may not substitute its conclusions for those of the trial court merely because there may be credible evidence supporting a different result. *In re Estate of Breeden v. Gelfond,* 87 P.3d 167, 172 (Colo.App.2003).

■ We review de novo the court's application of the governing legal standards. *Ocmulgee Props. Inc. v. Jeffery,* 53 P.3d 665, 667 (Colo.App.2001).

## II. Breach of Contract

We reject defendant's various contentions that the trial court erred in finding that he breached the agreement and in awarding damages for that breach.

### A. Repudiation by Resignation

Defendant first contends that the trial court erred in determining that he repudiated the agreement by resigning from FPA. We disagree.

■ A repudiation of a contract must consist of a party's present, positive, unequivocal refusal to perform the contract, not a mere threat to abandon its obligations under the contract. *Lake Durango Water Co. v. Pub. Utils. Comm'n,* 67 P.3d 12, 21 (Colo.2003); *see also Lantec, Inc. v. Novell, Inc.,* 306 F.3d 1003, 1014 (10th Cir.2002) ("A repudiation occurs when a party to a contract makes 'an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance.'" (quoting Uniform Commercial Code § 2–610 cmt. 1 (1989))); *Scott v. Majors,* 980 P.2d 214, 218 (Utah Ct.App.1999). "Mere expression of doubt as to [a party's] willingness or ability to perform is not enough to constitute a repudiation." *Lantec, Inc.,* 306 F.3d at 1014 (quoting Restatement (Second) of Contracts § 250 cmt. b (1979)). Repudiation must be apparent in the objective sense: "In order to constitute a repudiation, a party's language must be *sufficiently positive to be reasonably interpreted* to mean that the party will not or cannot perform." Restatement (Second) of Contracts § 250 cmt. b (emphasis added). Furthermore, language that is accompanied by a breach by nonperformance may amount to a repudiation even though, standing alone, it would not be sufficiently positive. *Id.*

The significant issue of contention among the parties is whether defendant repudiated the contract by voluntarily resigning his position with FPA or whether he was terminated by FPA.

■ Whether a person has resigned is a question of fact to be determined by the trier of fact. *Mauldin v. Panella,* 17 P.3d 837, 840 (Colo.App.2000).

■ A resignation is a "formal notification of relinquishing an office or position." *Id.* (quoting definition appearing at *Black's Law Dictionary* 1311 (7th ed.1999)). "To constitute a resignation, it must be unconditional and with the intent to operate immediately as such." *Leach v. Ford Motor Co.,* 299 F.Supp.2d 763, 769–70 (E.D.Mich.2004) (quoting *Poland v. Glover,* 111 F.Supp. 675, 676 (W.D.N.Y.1953)). "Loose and ambiguous

language" is not sufficient to prove resignation, "at least where the subsequent acts and declaration of the [employee] are inconsistent with any such contention." *Id.* at 770 (quoting 2 Fletcher, *Cyclopedia Corporations* § 350 (perm. ed.1990 rev. vol.)) (noting that, in Michigan, "to be voluntary and effective, a resignation need not include any magic words" and that "whether an employee has resigned is determined by considering the full circumstances and all the credible and competent evidence submitted by the parties").

■ We conclude that the evidence in the record supports the trial court's finding that defendant repudiated the contract by resigning from FPA. Defendant's e-mails on November 23 support the finding that defendant immediately intended to terminate his relationship with FPA and to discontinue performance under the employment portion of the agreement. After telling Mowbray that Mowbray was on his own, defendant ordered Mowbray to remove defendant's name and "any reference to or about" defendant from FPA. He demanded unencumbered real property as equity, indicated he would no longer be providing credit to FPA, and ordered Lawry and Mowbray to "[u]se their own credit." These statements were not a mere threat to abandon his obligations under the employment portion of the agreement, but reflect an unequivocal refusal to perform that agreement, namely, to (1) "assume all marketing and related duties designed to develop and expand [FPA] and to identify new opportunities for [FPA]"; (2) work with Lawry to determine which accounts to pay; (3) continue working as an outfitter and ordering stock; (4) "[liaise] and help [Lawry] with transition of accounts, wages and procedures"; and (5) be "responsible for management of existing staff and interview all prospective staff." At trial, Lawry testified that she understood defendant's e-mails to mean that he had quit.

Moreover, defendant's December 3 e-mail to Lawry requesting return of his credit card invoices and income tax information and promising to deliver to FPA's shop "[anything] that is [FPA's] and pertains to [FPA]" objectively confirmed that defendant had severed business ties with FPA. The trial court's finding that defendant's resignation was "inartful" does not render the resignation ambiguous. *Cf. Reg'l Transp. Dist. v. Aurora Pub. Schs.,* 45 P.3d 781, 783 (Colo.App.2001) (concluding that an inartfully drafted statute is not ambiguous).

Even if these e-mails, standing alone, were not sufficiently positive to establish that defendant intended to repudiate the employment portion of the agreement by resigning from FPA, they were accompanied by defendant's breach by nonperformance and, thus, they amounted to a repudiation. For example, the evidence demonstrates that defendant ceased performing his employment obligations under the agreement after November 23, and there was no discussion between the parties or between their attorneys that defendant wanted to continue working for FPA. More important, defendant removed from FPA's fly shop the permits and licenses that belonged to FPA or that defendant held in trust for FPA, and he notified the Colorado Department of Wildlife that FPA could no longer operate under "his" permits. Defendant told FPA's guides that he was no longer FPA's outfitter, that they could not go on float trips under "his" river outfitting licenses, and that they could not go on United States Forest Service property because FPA no longer had the use of "his" permits. There was also evidence that defendant was thinking about starting a competing outfitting and guide business with the permits he had removed from FPA.

Defendant argues that there are other reasonable interpretations and explanations for the e-mails, specifically, that defendant was fired from FPA. However, when the evidence is conflicting, we may not substitute our conclusions for those of the trial court merely because there may be credible evidence supporting a different result. *See In re Estate of Breeden,* 87 P.3d at 172.

■ We also reject defendant's assertion that it was illogical for the trial court to find that he resigned from FPA, because he would forfeit $330,000 in compensation. *See Leach,* 299 F.Supp.2d at 771 ("The logic: an individual does not abandon a hugely financially rewarding job in his profession of

choice, to become unemployed."). Although this may be a factor the trial court considers when determining whether an employee has resigned, it is not conclusive. Whether or not defendant's resignation was logical, there is evidentiary support for the trial court's finding that defendant resigned from FPA. Although defendant proffers that he had no intention of forfeiting this money without any prospective substitute employment, he testified at trial that he was considering starting a competing outfitting and guide business with the permits he held in trust for FPA. It is the province of the trial court to assess the reliability of the evidence and credibility of witnesses in a bench trial. *Schupper v. Smith*, 128 P.3d 323, 327 (Colo.App.2005). Moreover, because defendant was the first to breach the terms of the employment agreement, he is not entitled to relief on the basis of forfeiture. *See Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 64 (Colo.2005).

## B. Retraction

■ Defendant contends that, even if the e-mails had been definite enough to act as a repudiation, subsequent events demonstrate that he retracted his resignation. We are not persuaded.

■ A repudiation may be retracted when the repudiator notifies the injured party that he will proceed with his performance. *Johnson v. Benson*, 725 P.2d 21, 25 (Colo. App.1986). A retraction is ineffective, however, when the injured party has materially changed his position in reliance on the repudiation or notified the repudiator that he considers the repudiation to be final. *Id.* The filing of a lawsuit based on repudiation is generally held to constitute a material change of position. *Id.* (citing Restatement (Second) of Contracts § 256 cmt. c (1981)). Determining whether a retraction has occurred is ordinarily a question of fact. *Id.*

Defendant contends that the following evidence is inconsistent with a finding that he resigned: (1) plaintiffs never asked for, or received, written notice that he was resigning; (2) defendant's attorney testified that defendant never told him that he had resigned, and plaintiffs' attorney was never told by defendant or defendant's attorney that defendant had resigned; (3) at the December 9 meeting between the parties' attorneys, nothing was resolved with respect to defendant's departure from FPA; and (4) a letter dated December 15 from defendant's attorney to plaintiffs' attorney stated that defendant had "no intention to disregard his obligations under the [agreement]."

■ We reject these four arguments. As to the first, because Lawry reasonably interpreted defendant's e-mails as his resignation from FPA, there was no reason why she would ask for further written notice that defendant was resigning. Second, to constitute an effective resignation, the law does not require that defendant provide formal written notice of his resignation to either plaintiffs or their attorney. *See Mauldin*, 17 P.3d at 840. Third, whether defendant told his attorney that he resigned is irrelevant to the issue whether his language and conduct was sufficiently positive to be reasonably interpreted by plaintiffs to mean that he was resigning from FPA and would not perform his duties under the employment portion of the agreement. Finally, the series of events which are urged to be evidence of retraction occurred after plaintiffs' attorney's November 24 letter to defendant, which contained statements to the effect that Lawry had accepted defendant's resignation. By the time of the December 9 meeting and defendant's attorney's December 15 letter stating that defendant had no intention to disregard his obligations, plaintiffs' attorney had already notified defendant that Lawry accepted defendant's resignation. Indeed, counsel had already begun negotiating with the bank to obtain a loan to pay the balance owed to defendant. *See Johnson*, 725 P.2d at 25; Restatement (Second) of Contracts § 256 cmt. c. In our view, these facts augur against retraction and support the trial court's finding that there had been no retraction by defendant.

We thus conclude that the trial court's finding that defendant's "subsequent conduct reflects a failure to truly and adequately rescind his resignation" is amply supported by the record and may not be disturbed on review. *See Johnson*, 725 P.2d at 25.

## C. Lost Profits

Defendant further argues that the trial court erred in allowing plaintiffs to recover damages for FPA's actual and future lost profits on their breach of contract claim. We disagree.

█ The fact finder has the sole prerogative to assess the amount of damages, and its award will not be set aside unless it is manifestly and clearly erroneous. *Logixx Automation, Inc. v. Lawrence Michels Family Trust*, 56 P.3d 1224, 1227 (Colo.App.2002).

█ The goal of a damage award is to " 'place the parties in the same financial position they would have occupied had the contract terms been fulfilled.' " *Colo. Nat'l Bank v. Friedman*, 846 P.2d 159, 174 (Colo. 1993) (quoting *Republic Nat'l Life Ins. Co. v. Red Lion Homes, Inc.*, 704 F.2d 484, 488 (10th Cir.1983)). Consequential damages may be awarded, in some cases, for profits lost as a result of a breach of contract. *Id.; Denny Constr., Inc. v. City & County of Denver*, 170 P.3d 733, 738 (Colo.App.2007) *(cert. granted* Nov. 26, 2007); *McDonald's Corp. v. Brentwood Ctr., Ltd.*, 942 P.2d 1308, 1310 (Colo.App.1997). However, "[l]ost profits may not be awarded if they are speculative, remote, imaginary, or impossible to ascertain." *McDonald's Corp.*, 942 P.2d at 1310.

█ A party seeking to recover damages for lost profits must prove three things. *Denny Constr., Inc.*, 170 P.3d at 739. First, the party must prove that the lost profits were reasonably foreseeable to all parties at the time they entered into the contract. *Id.* Second, the party must demonstrate that the damages sought "are traceable to and are the direct result of" the breaching party's conduct. *Id.* (quoting *Graphic Directions, Inc. v. Bush*, 862 P.2d 1020, 1025 (Colo.App. 1993)). Third, the party must prove that there is a reasonable basis for computing such damages. *Id.*

█ Initially, we reject defendant's suggestion that plaintiffs sought damages for lost profits only with respect to their claim for interference with business relationships and that, because the trial court found against plaintiffs on this claim, specifically, that plaintiffs failed to prove that defendant "caused the guides to breach any contracts with [p]laintiffs," the trial court's damages award for lost profits cannot stand.

The record demonstrates that plaintiffs' claim for damages with respect to their breach of contact claim included lost profits based upon lost guide trips. In their breach of contract claim, plaintiffs alleged, among other things, that defendant told FPA guides that he was withdrawing the Forest Service permits and licenses from FPA "so [FPA] could not book any guide trips" and sought damages for breach of contract "in an amount to be proven at trial." In their closing brief, plaintiffs explained to the trial court that they were not seeking double recovery of damages for lost profits, but rather "alternatively plead[ed]" damages for lost profits under both the breach of contract and interference with business relationships claims. They also asserted that testimony from at least two guides indicated that "their resignations were in no small part caused by FPA not having the [United States Forest Service] permit" and the loss of these guides "caused FPA damages in lost profits." In their proposed findings of fact and conclusions of law, plaintiffs sought damages for FPA's "actual and future lost profits for lost guide trips caused by [defendant's] breach of contract and interference with the guides." Based on the foregoing, we conclude that plaintiffs sought damages for lost profits based not only on defendant's alleged interference with business relationships, but also on defendant's breach of contract.

It is also clear that the trial court awarded damages for lost profits based on lost trips caused by defendant's breach of contract. Indeed, in its order denying defendant's C.R.C.P. 59 motion, the trial court clarified that the damage award for lost profits was based on defendant's breach of contract, "rather than any breach of contract by guides allegedly caused by [d]efendant's actions." Accordingly, there is no vitality in defendant's argument that there was no finding of liability upon which the award of lost profits could be based.

Furthermore, the trial court's finding that plaintiffs failed to prove an element of tortious interference with business relations—specifically, that defendant did not intentionally cause the guides to resign—is irrelevant to whether the resignations of the other FPA guides were a foreseeable result of defendant's breach of contract. *Compare Electrolux Corp. v. Lawson,* 654 P.2d 340, 341–42 (Colo.App.1982) (one who causes a third party to terminate a contract terminable at will does not improperly interfere with that relationship unless wrongful means, such as physical violence, fraud, civil suit, or criminal prosecution, are used), *abrogated by Jet Courier Serv., Inc. v. Mulei,* 771 P.2d 486 (Colo.1989), *with Denny Constr., Inc.,* 170 P.3d at 739 (an injured party must prove that the lost profits were reasonably foreseeable to all parties to the contract at the time they entered into the contract).

We also conclude that there is ample evidence in the record to support the trial court's finding that defendant's breach of contract resulted in FPA's "lost profits for lost guide trips." There was evidence that as a result of defendant's resignation and withholding of Forest Service permits, several guides resigned from FPA and that, at the time of trial, FPA had thirty to forty percent fewer guides. There was testimony that because of employee loyalty, rumors, and FPA's small-town location, FPA had a difficult time replacing guides. Lawry testified that from the time defendant removed the Forest Service permits in December 2004 until May 2005, FPA had no Forest Service permits, which prevented guides from taking customers on fishing trips. Even if the permits had been available, FPA was unable to hire new guides to replace those who resigned. Thus, there were not enough guides to accommodate all the customers who wished to go fishing. The combination of the missing permits and the lack of guides resulted in guided trips being cancelled. Thus, it was foreseeable that defendant's resignation and withholding of Forest Service permits would cause guides to resign, which, in turn, caused guide trips to be cancelled. Plaintiffs' expert's calculation of lost profits was based on guide trips lost and upon her assumption that it would take FPA four

years to recover from the resignations of the guides. Defendant does not appear to dispute the actual calculation.

### D. Constructive Trust

Next, defendant asserts that the trial court erred in imposing a constructive trust on Permit SOP89. We address and reject each of his arguments in turn.

A constructive trust is a flexible equitable remedy that may be imposed to prevent unjust enrichment. It enables the restitution of property that in equity and good conscience does not belong to the defendant. *Mancuso v. United Bank,* 818 P.2d 732, 737 (Colo.1991); *In re Marriage of Allen,* 724 P.2d 651, 657 (Colo.1986); *Page,* 197 Colo. at 315, 592 P.2d at 797–98; *Bryant v. Cmty. Choice Credit Union,* 160 P.3d 266, 271 (Colo.App.2007); *Pioneer Real Estate, Inc. v. Larese,* 762 P.2d 720, 724 (Colo.App. 1988). By imposing a constructive trust, a court awards the successful plaintiff a personal order requiring the defendant to transfer specific property to the plaintiff. *Pioneer Real Estate, Inc.,* 762 P.2d at 724. "The doctrine of constructive trusts is extremely flexible." *Mancuso,* 818 P.2d at 737 (citing *Page,* 197 Colo. at 317, 592 P.2d at 799).

For the court to impose a constructive trust, there must be some property to which the trust attaches. *In re Marriage of Allen,* 724 P.2d at 657; *Voller v. Gertz,* 107 P.3d 1129, 1133 (Colo.App.2004); *cf. State v. Benjamin,* 41 Colo.App. 520, 522–23, 587 P.2d 1207, 1209 (1978) (refusing to impose constructive trust where plaintiff failed to trace property wrongfully taken to proceeds being claimed); *Schmidt–Tiago Constr. Co. v. City of Colorado Springs,* 633 P.2d 533, 534 (Colo.App.1981) (refusing to create a constructive trust because "there is no res").

There is no support for defendant's contention that constructive trusts can only be imposed on real property. To the contrary, courts consistently have recognized a broader definition of "property" in cases involving constructive trusts. *See, e.g., Lyons v. Jefferson Bank & Trust,* 781 F.Supp. 1525, 1530–31 (D.Colo.1992) (applying Colorado's

substantive law on constructive trusts, court placed proceeds from the sale of treasury notes in constructive trust); *Bryant,* 160 P.3d at 272 (concluding a constructive trust could be imposed on the certificates of deposit the credit union liquidated); *Mahon v. Harst,* 738 P.2d 1190, 1195 (Colo.App.1987) (noting that the proper remedy was to impose a constructive trust on management fees for the benefit of the partnership).

▮ Here, the Forest Service permits are the principal means by which FPA earns revenue. The parties' agreement contemplated that Permit SOP89 would be held in trust and used exclusively in FPA's name and for its benefit. Specifically, the agreement acknowledges that the permits held by defendant "are necessary for and relevant to the operation and running of the Business by [FPA]"; that defendant will hold the permits "absolutely for the benefit of the business"; and that the "continued holding and availability of these licenses is integral to the ongoing viability of the business." One could hardly posit a clearer example of a business asset upon which a constructive trust can be imposed. *Cf. Voller,* 107 P.3d at 1134 (court could not find any asset upon which to impose a constructive trust).

▮ Defendant also argues that, because the trial court rejected the breach of fiduciary duty claim, concluding that no confidential relationship existed between the parties, no constructive trust could be imposed. However, a confidential relationship is not a requirement for imposing a constructive trust. "A constructive trust ... can attach to property obtained by fraud, duress, *or* the abuse of a confidential relationship, *Page,* 197 Colo. at 315, 592 P.2d at 798, *or* to any other property that 'in equity and good conscience' does not belong to the constructive trustee." *In re Marriage of Allen,* 724 P.2d at 657 (emphasis added); *see also Yetter Well Serv., Inc. v. Cimarron Oil Co.,* 841 P.2d 1068, 1070 (Colo.App.1992) ("A constructive trust is an extremely flexible remedy, appropriate in circumstances involving fraud or duress, or when a confidential relationship exists, and also to prevent unjust enrichment. It is also appropriate if innocent third persons have subsequently ac-

quired an interest in the property." (citation omitted)).

In its decision to impose a constructive trust, the trial court found that the parties were in a "continuing business relationship" and that defendant abused that relationship by misadvising Lawry "into believing that only [defendant] could hold the ... permit," and by failing properly to disclose "his knowledge of the permitting system to wrongfully deprive [FPA] of the permit which was part and parcel of the sale of FPA." The court also found that plaintiffs "relaxed their vigilance due to [defendant's] representations that he would hold the permits and work for [FPA] for 10 years"; that defendant's misrepresentations concerning the permit "induced Lawry to allow [defendant] to retain the permit upon the transfer of the business"; and that "Lawry was justified in her trust [of defendant], and [defendant] abused Lawry's trust by retaining the assorted permits." Finally, the court determined defendant would be unjustly enriched if he were allowed to "retain a primary asset of the business."

In its order denying defendant's motion for C.R.C.P. 59 relief, the trial court affirmed its decision to impose a constructive trust on Permit SOP89, but did so without making a specific finding that a confidential or other business relationship existed between the parties:

The Court determined in its *Findings of Fact, Conclusions of Law, and Order* ... that the agreement between the parties ("Agreement") set forth terms indicating that Plaintiffs were to retain Defendant's services as an employee or independent contractor for a period of ten years.... As noted by the Court, the primary purpose of the Agreement was to effectuate the sale of Frying Pan Anglers, Inc. to Lawry.... Importantly, under the terms of the Agreement, the Permit was to be held by Defendant for the exclusive use and benefit of FPA, which created value in the Permit. At the suggestion of Defendant, as seller, and the uninformed agreement by Lawry, as buyer, the Permit was to be held for the exclusive benefit of Frying Pan Anglers, Inc., as the Permit

plays an integral role in the successful operation of the business. The Agreement thus contemplated that upon cessation of Defendant's service to FPA, Defendant was required to facilitate the transfer of the Permit by executing and submitting the United States Forest Service *Holder Initiated Revocation of Existing Authorization Form*, FS–2700–3a ("Form"). The Court opines that it would be manifestly unjust to permit Defendant to retain the Permit if he is no longer serving Frying Pan Anglers, Inc. in any capacity. The Court serves as a mechanism, through its imposition of a constructive trust, to compel Defendant to initiate in good faith the submission of the Form, while the United States Forest Service determines whether transfer will ultimately be effectuated.

We are not persuaded by defendant's argument that his representation to Lawry—that only he could hold Permit SOP89—was a representation of law, and therefore, not actionable. In support of this argument, defendant relies on *Two, Inc. v. Gilmore*, 679 P.2d 116 (Colo.App.1984), which states,

> A representation of law is only an expression of opinion and is impotent to void a contract or support an action for damages. A representation of what the law will or will not permit to be done is one upon which the party to whom it is made has no right to rely. If he does so it is at his own risk. The truth or falsehood of such a representation can be tested by ordinary vigilance and attention.

*Id.* at 117–18 (citation omitted).

Even if defendant's representation was one of law, plaintiffs have not sought to void the contract or enforce defendant's representation concerning the transferability of the permit. Rather, plaintiffs sought to enforce defendant's express promise under the contract to hold the permit for the absolute benefit of FPA. Thus, defendant's reliance on *Gilmore* is misplaced.

For the same reasons, we also reject defendant's contention that the trial court's imposition of a constructive trust was in error because plaintiffs unjustifiably relied upon defendant's misrepresentations concerning the permitting process and had a duty to inquire as to the transferability of the permit.

Finally, defendant argues that it was improper for the trial court to impose a constructive trust on Permit SOP89 under the theory of unjust enrichment because the parties had a written contract. We disagree.

Unjust enrichment is a judicially created remedy designed to avoid benefit to one to the unfair detriment of another. Unjust enrichment occurs when (1) at the plaintiff's expense, (2) the defendant received a benefit (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying. *Martinez v. Colo. Dep't of Human Servs.*, 97 P.3d 152, 159 (Colo.App.2003).

A plaintiff is entitled to recover based on the unjust enrichment of a defendant when the plaintiff has no alternative right under an enforceable contract. *Backus v. Apishapa Land & Cattle Co.*, 44 Colo.App. 59, 61–62, 615 P.2d 42, 44 (1980). "[I]f the elements of unjust enrichment are established, a plaintiff may be entitled to relief, even in the face of a contract with a clearly expressed contrary intent, if justice requires." *Martinez*, 97 P.3d at 159.

Here, the agreement does not address the disposition of Permit SOP89 in the event that defendant resigns from FPA or otherwise breaches the employment portion of the agreement. The permit is a primary asset of FPA and necessary to the successful operation of FPA. Thus, allowing defendant to keep the permit would unjustly enrich him.

We conclude that the trial court correctly applied the law of constructive trusts and agree with the court's reasoning underlying its decision to impose a constructive trust on Permit SOP89.

## E. Damages for Lawry's Time

Defendant argues that the trial court erred in awarding plaintiffs $2,625 for Lawry's time "spent dealing with consequences of [defendant's] breaches." We disagree.

The fact finder has the sole prerogative to assess the amount of damages, and its award will not be set aside unless it is manifestly and clearly erroneous. *Logixx Automation, Inc.,* 56 P.3d at 1227.

Here, the agreement provided that defendant was responsible for the cost of preparing year 2003 tax returns and other bookkeeping and administrative tasks. After defendant's resignation, Lawry testified that she spent seventy-five hours working primarily on preparing tax returns that were defendant's responsibility. Lawry valued her time at $35 per hour, which FPA's and Lawry's accountants agreed was reasonable. Accordingly, the damage award was supported by the evidence and is not clearly erroneous.

### III. Cross–Appeal

We also reject plaintiffs' several contentions regarding costs, damages, interest, and attorney fees.

### A. Award of Costs

Plaintiffs argue that the trial court erred in refusing to award costs to Lawry pursuant to section 13–17–202. We disagree.

Lawry, as a counterclaim defendant, and Mowbray, who was later dismissed as a party, submitted the following offer of settlement to defendant: "Lawry and Mowbray will jointly pay [defendant] $90,000 and these parties will dismiss with prejudice … Lawry's *individual* claims, all of the Defendant['s] counterclaims, and [defendant's] Third Party Claim against … Mowbray brought in this action. This offer includes costs and interest." (Emphasis added.) Defendant rejected the offer. The trial court summarily denied Lawry's request for costs incurred after the offer was made pursuant to section 13–17–202.

Plaintiffs, on the one hand, contend that the trial court erred in not applying section 13–17–202 under these circumstances. Defendant, on the other hand, asserts that the statute does not apply because the offer of settlement would not have completely resolved all claims asserted by all plaintiffs.

We agree with defendant, but for a slightly different reason.

Section 13–17–202(1)(a), C.R.S.2007, provides, in relevant part:

(1) (a) Notwithstanding any other statute to the contrary, in any civil action of any nature commenced or appealed in any court of record in this state:

(I) If the plaintiff serves an offer of settlement in writing at any time more than fourteen days before the commencement of the trial that is rejected by the defendant, and the plaintiff recovers a final judgment in excess of the amount offered, then the plaintiff shall be awarded actual costs accruing after the offer of settlement to be paid by the defendant.

(II) If the defendant serves an offer of settlement in writing at any time more than fourteen days before the commencement of the trial that is rejected by the plaintiff, and the plaintiff does not recover a final judgment in excess of the amount offered, then the defendant shall be awarded actual costs accruing after the offer of settlement to be paid by the plaintiff.

The statute's reference to *"the* plaintiff" and *"the* defendant," rather than to *"a* plaintiff" and *"a* defendant," does not inform our analysis of defendant's assertion that an offer of settlement must resolve all claims of all parties before it can constitute a valid offer under section 13–17–202.

We interpret the statute to reflect the General Assembly's intent. *See Buckley v. Chilcutt,* 968 P.2d 112, 117 (Colo. 1998). We seek to ascertain legislative intent, starting with the plain language of the statute and giving the words their ordinary meaning. *USA Tax Law Ctr., Inc. v. Office Warehouse Wholesale, LLC,* 160 P.3d 428, 431 (Colo.App.2007). If that language is unambiguous, we look no further. *Id.*

The purpose of section 13–17–202 is to encourage the settlement of litigation by increasing the cost of proceeding with a lawsuit after the opposing party has made a reasonable settlement offer. *Weeks v. City of Colorado Springs,* 928 P.2d 1346, 1351 (Colo.App.1996); *Taylor v. Clark,* 883 P.2d 569, 570 (Colo.App.1994). Thus, the statute

encourages settlement by imposing a sanction on a party who rejects a reasonable offer by another party and recovers less against that party than the party's offer. *Taylor,* 883 P.2d at 571.

Section 13–17–202 does not limit any party's right to tender a non-section 13–17–202 offer of partial or complete judgment or compromise. However, an offer that does not satisfy the requirements of section 13–17–202 does not entitle the offeror to the special benefits of section 13–17–202.

█ Section 13–17–202(1)(b), C.R.S.2007, states that actual costs "shall not include attorney fees but shall mean costs actually paid or owed by *the party* . . . in connection with *the case."* (Emphasis added.) Under Lawry's interpretation, a co-plaintiff could trigger a defendant's obligation to pay the entire costs of the case, even costs borne by other parties to the case not joining in the offer, where the case would be ongoing, with costs of litigation continuing to accrue. This interpretation, applied in the present context, does not further section 13–17–202's purpose of encouraging settlement and, in our view, would lead to an unfair and unreasonable result.

█ Lawry tendered an offer of settlement to defendant in the amount of $90,000 for her *individual* claims. These would include the claims for defamation and fraud and, arguably, a portion of the breach of contract claim. However, the offer did not include claims that Lawry asserted derivatively on behalf of FPA (a duly organized, separate legal entity), such as the claims for interference with business relations, civil theft, conversion, breach of fiduciary duty, and breach of contract. FPA did not join in the settlement offer. Thus, while the settlement offer did not offer to dispose of any of FPA's claims against defendant, it nevertheless required defendant to dismiss *all* his counterclaims against Lawry *and* FPA. Under this settlement offer, defendant and FPA would continue to incur costs and fees to litigate all the same claims maintained by FPA with no counterclaims or setoff. In other words, Lawry's offer was not only conditioned upon defendant's accepting her terms regarding the monetary offer and

counterclaims against her (and Mowbray), but the offer was also conditioned upon defendant's dismissing counterclaims against a third party who would continue to maintain claims against defendant. We decline to follow a statutory construction that leads to such an unreasonable or absurd result. *See In re Marriage of Fickling,* 100 P.3d 571, 573 (Colo.App.2004).

We discern nothing in the statute that permits one to condition an offer of settlement upon dismissal of claims against a third party whose claims would not be resolved in the settlement. Additionally, because most of Lawry's claims were inextricably bound up with, and, in some cases derivative of, FPA's claims, it would have been necessary to a settlement that she include FPA in the offer of settlement or somehow apportion the costs. *See, e.g., Weeks,* 928 P.2d at 1351 ("[A]n offer of settlement made to multiple plaintiffs must apportion the settlement amount among the plaintiffs and allow each plaintiff to decide independently whether to settle. Otherwise, an individual plaintiff cannot independently weigh the risks and benefits of the offer against the judgment that may be obtained for that plaintiff."); *Taylor,* 883 P.2d at 571("[A]n unapportioned offer to multiple parties takes away the individual offeree's ability to make a meaningful choice between accepting the offer or continuing with the litigation, and application of the statute under these circumstances does not comport with the policy of encouraging the settlement of lawsuits.").

The lack of mutuality in Lawry's settlement offer is demonstrated by looking to the damages awarded. The trial court awarded damages to defendant "and against the *Plaintiffs "* on defendant's breach of contract counterclaim. (Emphasis added.) The trial court's use of the plural ("plaintiffs") denotes that the damages award was entered against both FPA and Lawry jointly. It is not known what portion of such award is directed against Lawry or if she will pay any portion of the award or costs associated with it.

By its own terms, Lawry's offer was not a valid section 13–17–202 offer because it went beyond the complete resolution of Lawry's

own claims. *See, e.g., Ass'n of Apartment Owners of Wailea Elua v. Wailea Resort Co., Ltd.*, 100 Hawai'i 97, 58 P.3d 608, 632 (2002) (applying a statute similar to section 13–17–202, court concluded that resort's offer of judgment to apartment owners association did not fully and completely resolve association's claims, and thus resort was not entitled to costs based on offer of judgment, although it offered more money than association was ultimately awarded in damages, because offer excluded claim for declaratory judgment to establish ownership of drain pipes, and offer reserved right to challenge court order on issue of ownership).

In light of the absence of FPA from the settlement offer, we discern no error in the trial court's denial of Lawry's request for costs pursuant to section 13–17–202.

### B. Confidential Relationship

■ Plaintiffs contend that the trial court erred in finding that no confidential relationship existed between the parties with respect to the breach of fiduciary duty claim, and that this finding is inconsistent with the trial court's finding that defendant abused the parties' confidential relationship which it made in connection with its decision to impose a constructive trust. However, plaintiffs specifically state in their reply brief that they "do not seek redress" of the trial court's denial of their breach of fiduciary duty claim. Because plaintiffs do not appeal the trial court's conclusion that they failed to establish that defendant breached a fiduciary duty, and because we have affirmed the trial court's imposition of a constructive trust, amending the court's confidential relationship finding made with respect to the breach of fiduciary duty claim would have no effect on the constructive trust ruling; thus, we do not address this argument. *See Jackson v. Moore*, 883 P.2d 622, 625 (Colo.App.1994) (a determination of the correctness of the court's mistrial ruling would have no effect on the ultimate disposition reached in the second trial; therefore court did not address that ruling).

### C. Damages Awarded to Defendant

■ We conclude that the trial court properly awarded defendant damages in the amount of $73,328.77, plus pretrial interest, representing the balance due on the purchase price.

Here, the trial court found that, although defendant "first breached the Agreement and his breaches were material ... [plaintiffs] failed to make timely payments to [defendant] pursuant to Section 5 of the Agreement upon [plaintiffs'] acceptance of [defendant's] resignation." The court then awarded defendant the balance due on the $150,000 purchase price.

Plaintiffs argue that this was error, because the employment agreement and the purchase and sale of FPA stock were all part of a single inseparable transaction and contract. Therefore, argue plaintiffs, defendant's material breach of the employment agreement constituted a breach of the entire agreement and Lawry was entitled to suspend her performance, specifically, payment for amounts due under the purchase and sale agreement. *See Coors*, 112 P.3d at 64 ("Under contract law, a party to a contract cannot claim its benefit where he is the first to violate its terms."); *Scientific Packages, Inc. v. Gwinn*, 134 Colo. 233, 237, 301 P.2d 719, 722 (1956) (material breach deprives party of right to demand performance by other).

■ A material term goes to the root of the matter or essence of the contract. Materiality must be assessed in the context of the expectations of the parties at the time the contract was formed. The trier of fact should consider the importance or seriousness of the breach and the likelihood that the injured party will nonetheless receive substantial performance. *Coors*, 112 P.3d at 64.

Here, the agreement consists essentially of two separate components: (1) an agreement between Lawry and defendant for the purchase and sale of the stock of FPA whereby defendant would transfer to Lawry 100% of the stock of FPA and, in consideration for that transfer, Lawry would pay defendant $150,000 over a period of eighteen months; and (2) an employment agreement between FPA and defendant whereby defendant would receive annual payments in exchange for his continued involvement in FPA, includ-

ing holding Forest Service permits for the benefit of FPA. Thus, this a three-party contract where the root of the matter or essence of the contract is two-fold.

Here, there was a material breach of one term of the contract (the employment term), but not the other (the purchase and sale term). Once defendant transferred his stock to Lawry, he fully satisfied his obligations to Lawry under the purchase and sale portion of the agreement and Lawry was obligated to pay defendant the purchase price. Lawry received substantial, if not complete, performance under the purchase and sale agreement, and she remains fully responsible for the purchase price.

Thus, although we agree that defendant's breach of his duties under the employment portion of the agreement excused all future performance by FPA (such as payment of salary), we are not persuaded that defendant's breach excused Lawry's obligation to pay for the shares of stock which she had received. Indeed, defendant's breach of the employment agreement concerned obligations owed to FPA. Plaintiffs have cited no case, and we have found none, standing for the proposition that, in a three-party contract, one party's breach of obligations owed to a second excuses performance by the third.

Thus, we find no error in the outcome reached by the trial court whereby it awarded to plaintiffs damages for defendant's breach of the employment agreement and awarded to defendant the amounts due under the purchase and sale portion of the agreement.

### D. Pretrial Interest

■ We reject plaintiffs' contention that the trial court did not award pretrial interest on defendant's conversion of the Grizzly Permit.

■ The measure of damages for conversion is the value of the converted property plus interest from the time of conversion to the time of trial. *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 882 n. 6 (Colo.1994); *Masterson v. McCroskie*, 194 Colo. 460, 465, 573 P.2d 547, 551 (1978).

Here, the only value of the Grizzly Permit was in its ability to generate profits for guided tours on the Colorado River. Because the trial court awarded interest on FPA's lost profits, we conclude that it did indeed award interest on the value of the Grizzly Permit.

### E. Attorney Fees

Finally, we reject plaintiffs' contentions that they were entitled to an award of attorney fees.

#### 1. Attorney Fees as Consequential Damages

Plaintiffs argue that the trial court should have awarded attorney fees as consequential damages. We are not persuaded.

■ "As a general rule, in the absence of any contractual or statutory liability therefor, attorney[ ] fees and expenses of litigation of a plaintiff's claim are not recoverable as an item of damages either in a contract or a tort action." *Hedgecock v. Stewart Title Guar. Co.*, 676 P.2d 1208, 1211 (Colo.App.1983).

■ However, if attorney fees are sought based on a contractual agreement to award fees to the prevailing party, they should be treated as costs, at least where the fee-shifting contractual provision is not the subject of the dispute between the parties and the contract itself is proved to exist. *Butler v. Lembeck*, 182 P.3d 1185, 1189 (Colo.App. 2007).

■ If attorney fees are part of the substance of a lawsuit and are sought as a legitimate consequence of the tort or breach of contract sued upon, they are damages. *See Skyland Metro. Dist. v. Mountain W. Enter., LLC*, 184 P.3d 106, 131 (Colo.App. 2007) ("Attorney fees and costs in removing the cloud on title ... constitute special damages in a slander of title action."); *In re Marriage of Hill*, 166 P.3d 269, 272 (Colo. App.2007) ("When fees are sought as a consequence of the tort or breach of contract sued upon, such as in insurance bad faith claims, they are part of the substance of the claims asserted and are treated as damages."); *Steele v. Law*, 78 P.3d 1124, 1129 (Colo.App. 2003) (observing that attorney fees may be

awarded as damages "where the attorney fees or costs are the subject of the lawsuit, as for example, where the suit is brought by an attorney to enforce a fee agreement"); *cf. Bunnett v. Smallwood,* 793 P.2d 157, 163 (Colo.1990) (concluding the non-breaching party to a release who successfully defends a lawsuit brought in violation of the agreement is *not* entitled to an award of attorney fees as damages).

■ In addition, when a party claims it has incurred attorney fees as foreseeable damages arising from a breach of contract, such fees are considered special damages, which must be pleaded in the complaint pursuant to C.R.C.P. 9(g). *See* C.R.C.P. 9(g) ("When items of special damage are claimed, they shall be specifically stated."); Fed. R.Civ.P. 9(g) (same); *In re American Cas. Co.,* 851 F.2d 794, 802 (6th Cir.1988) (city's request for attorney fees in its breach of contract action against building contractor and its surety was in nature of special damages and failure to plead them as such precluded their award); *Maidmore Realty Co. v. Maidmore Realty Co.,* 474 F.2d 840, 843 (3d Cir.1973) ("Claims for attorney fees are items of special damage which must be specifically pleaded under Federal Rule of Civil Procedure 9(g). In the absence of allegations that the pleader is entitled to attorney's fees, therefore, such fees cannot be awarded." (citation omitted) ); *Rural Water Dist. No. 1 v. City of Wilson,* 184 F.R.D. 632, 633 (D.Kan.1998) (noting that in breach of contract action, claim for attorney fees was in the nature of special damages that must be pleaded); *Sandy Valley Assocs. v. Sky Ranch Estate Owners Ass'n,* 117 Nev. 948, 35 P.3d 964, 969 (2001) (when a party claims it has incurred attorney fees as foreseeable damages arising from tortious conduct or a breach of contract, such fees are considered special damages and must be pleaded as such in the complaint), *receded from on different grounds by Horgan v. Felton,* 170 P.3d 982 (Nev.2007); *cf. Modbilt Homes, Inc. v. Sure–Built, Inc.,* 534 P.2d 332, 333 (Colo. App.1975) (not published pursuant to C.A.R. 35(f) ) (where there was evidence to support refusal to award special damages for attorney fees based on defendant's breach of con-

tract, result would not be disturbed on appeal).

■ A complaint's request for attorney fees in a general prayer for relief does not plead special damages. *Sandy Valley Assocs.,* 35 P.3d at 969.

■ Here, plaintiffs' complaint contained no identification of attorney fees as special damages incurred as a result of defendant's conduct, and, thus, plaintiffs are precluded from recovering those fees as damages. *See* C.R.C.P. 9(g). Instead, plaintiffs sought attorney fees "incurred ... in pursuing this matter, according to the terms of the Contract with Defendant." The agreement here contains an arbitration provision which awards attorney fees to the prevailing party in a dispute settled by arbitration. Nothing else in the agreement addresses the subject of attorney fees. Thus, contrary to plaintiffs' contention, we conclude the attorney fees in this case were not part of the substance of their breach of contract action against defendant but, instead, were sought under the fee-shifting provision of the parties' agreement.

### 2. Prevailing Party

We now address, and reject, plaintiffs' argument that the trial court erred in declining to award FPA attorney fees as the prevailing party under the fee-shifting provision of the agreement.

■ Attorney fees are generally not recoverable in the absence of "a specific contractual, statutory, or procedural rule providing otherwise." *Waters v. Dist. Court,* 935 P.2d 981, 990 (Colo.1997); *accord Voller,* 107 P.3d at 1134.

■ The determination of which party prevailed for purposes of a fee-shifting agreement is committed to the trial court's discretion. *Dennis I. Spencer Contractor, Inc. v. City of Aurora,* 884 P.2d 326, 328 n. 6 (Colo.1994); *Bedard v. Martin,* 100 P.3d 584, 593 (Colo.App.2004); *Brock v. Weidner,* 93 P.3d 576, 579 (Colo.App.2004). When each party prevails in part, the trial court generally must select one party as the overall winner for purposes of the fee-shifting agreement. *See Brock,* 93 P.3d at 579 (fee-shifting provi-

sions generally contemplate that there will be one winner and one loser regarding payment of attorney fees; when the provision states that the prevailing party "shall be entitled" to recover fees, the trial court must award reasonable fees to the prevailing party). However, in a proper case, the trial court may rule that neither party prevailed and award no fees. *Remote Switch Sys., Inc. v. Delangis,* 126 P.3d 269, 274 (Colo.App.2005); *Wheeler v. T.L. Roofing, Inc.,* 74 P.3d 499, 503 (Colo.App.2003).

The trial court is in the best position to determine which party has prevailed. *Bedard,* 100 P.3d at 593. We will find an abuse of discretion only if the trial court's ruling was manifestly arbitrary, unfair, or unreasonable. *Remote Switch Sys., Inc.,* 126 P.3d at 274.

Here, although FPA succeeded on its breach of contract and conversion claims, the trial court also ruled against it on several other claims and found in favor of defendant on his breach of contract counterclaim.

Under these circumstances, we perceive no abuse of discretion in the trial court's decision that no party was entitled to an award of attorney fees as a prevailing party. *See id.* at 275 (because both employer and employee essentially prevailed on a significant claim, trial court did not abuse its discretion in determining that neither party prevailed and denying employee's request for costs); *see also Archer v. Farmer Bros. Co.,* 90 P.3d 228, 231 (Colo.2004) (in cases involving multiple claims, "where either party could arguably be considered the 'prevailing party,' the trial court is in the best position to evaluate the relative strengths and weaknesses of each party's claims, the significance of each party's successes in the context of the overall litigation, and the time devoted to each claim").

Moreover, the trial court could also have concluded that the fee-shifting provision was applicable only to arbitrations and was not applicable in a civil suit.

Here, the parties' agreement contains an arbitration provision which specifies at section 19.1 that "in the event of any dispute arising at any time between the parties such dispute shall be determined ... [by arbitration]." Section 19.4 further provides that the "prevailing party in *such dispute* shall be entitled to recover all reasonable costs and legal expenses from the other parties." (Emphasis added.)

When determining the scope of an arbitration agreement, we apply ordinary principles of contract interpretation. *Smith v. Multi–Fin. Secs. Corp.,* 171 P.3d 1267, 1270 (Colo.App.2007); *BFN–Greeley, LLC v. Adair Group, Inc.,* 141 P.3d 937, 940 (Colo. App.2006).

We conclude FPA is not entitled to fees under the agreement because the attorney fees provision applies only to arbitrations. The attorney fees provision clearly contemplates that a party prevailing at an *arbitration* may receive an award of fees incurred in connection with that *arbitration.* The provision is silent about fees incurred in the prosecution or defense of a court action. *Cf. Harwig v. Downey,* 56 P.3d 1220, 1222 (Colo. App.2002) (in light of the broadly worded phrase "any ... *litigation* relating to this contract," the provision would apply in litigation between the contracting parties concerning a breach of the lease to which the sales contract was subject (emphasis added)); *Camelot Invs., LLC v. LANDesign, LLC,* 973 P.2d 1279, 1281 (Colo.App.1999) (the reference to both "arbitration" and "litigation" in the attorney fee provision confirms that the parties contemplated that attorney fees and costs could be recovered irrespective of whether such were incurred in arbitration or litigation). We have no reason to assume, and have seen nothing from which we can infer, that the parties to the agreement intended the provision to mean a party who prevails in a court action may recover attorney fees.

We therefore perceive no error in the trial court's refusal to award attorney fees to FPA.

In view of our determination that FPA is not entitled to recover attorney fees incurred in connection with the underlying litigation, we conclude that an award of FPA's appellate attorney fees is inappropri-

ate. *Cf. Camelot Invs., LLC,* 973 P.2d at 1281.

The judgment and the order denying costs are affirmed.

Judge LICHTENSTEIN and Judge CRISWELL * concur.