23CA2152 Puca v Peterson 12-26-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA2152
Elbert County District Court No. 20CV30061
Honorable Andrew C. Baum, Judge

Anthony Puca and Laura Puca,

Plaintiffs-Appellants,

v.

Earl E. Peterson, Caroline R. Peterson a/k/a Carol Peterson, and Elkhorn
Ranch Homeowner's Association, Inc.,

Defendants-Appellees.

JUDGMENT AFFIRMED AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE SULLIVAN
J. Jones and Lipinsky, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 26, 2024

Goodspeed Merrill, Miro Kovacevic, Robert S. Hunger, Englewood, Colorado, for
Plaintiffs-Appellants

Gelman & Norberg, Scott Gelman, Gabriel Gelman, Greenwood Village,
Colorado, for Defendants-Appellees Earl E. Peterson and Caroline R. Peterson
a/k/a Carol Peterson

Hall & Evans, LLC, Valerie Garcia, Heather A. Thomas, Denver, Colorado, for
Defendant-Appellee Elkhorn Ranch Homeowner's Association, Inc.

¶ 1     In this real property dispute among neighbors and a homeowners' association, plaintiffs, Anthony and Laura Puca, appeal the trial court's judgment entered in favor of defendants Earl E. and Caroline R. Peterson a/k/a Carol Peterson after a bench trial, and its dismissal of their breach of fiduciary duty claim against defendant the Elkhorn Ranch Homeowner's Association, Inc. (the Association).  We affirm the judgment and remand the case for further proceedings consistent with this opinion.

## I.     Background

¶ 2     Elkhorn Ranch is a residential community made up of hundreds of single-family lots in Elbert County.  The community is subject to and controlled by two governing documents — a declaration of covenants and residential improvement guidelines for all lots (the governing documents).  The Pucas and Petersons own adjacent properties in the community.

¶ 3     In December 2020, the Pucas filed suit against the Association and the Petersons, asserting claims for breach of the governing documents against all defendants and breach of fiduciary duty against the Association.

¶4	At the inception of the case, the Pucas filed a motion for a temporary restraining order and a preliminary injunction against the Petersons to prevent them from completing construction of a new residence and barn. The Pucas alleged, among other things, that those structures would interfere with their mountain view and violate certain height restrictions in the governing documents. The court denied the Pucas' request for a temporary restraining order shortly after the Pucas filed their complaint.

¶5	The court held a three-day hearing on the Pucas' preliminary injunction motion in January and February of 2021. After hearing extensive testimony and argument, the court denied the Pucas' request for a preliminary injunction as to the residence and ruled that the Petersons could continue construction "in compliance with the plans." The court granted the Pucas' motion in part, however, by enjoining further construction of the barn pending the case's final outcome. The Petersons completed construction of their residence in August 2021.

¶6	After the motions hearing but before trial, a different judge took over the case due to the prior judge's retirement. The case proceeded to a six-day bench trial in April and May of 2022.

¶ 7     At the conclusion of the Pucas' case-in-chief at trial, the Association moved to dismiss the Pucas' claims under C.R.C.P. 41(b)(1). The court granted the motion and dismissed the Pucas' claims against the Association.

¶ 8     After trial, the court issued detailed findings of fact and conclusions of law in a thorough thirty-seven-page order that resolved the Pucas' remaining claims against the Petersons. The court found that the locations of the Petersons' residence and barn, and the residence's height, complied with the governing documents. But the barn's height, the court found, was "problematic" because it negatively impacted the Pucas' view, contrary to section 2.02 of the Association's improvement guidelines. The court therefore ordered the Petersons to lower the barn's height by twenty inches. The court declined to award the Pucas any damages and determined that, because neither the Pucas nor the Petersons were "prevailing part[ies]," none of them were entitled to recover litigation costs under C.R.C.P. 54(d).

¶ 9     The Pucas now appeal. They contend that the trial court erred by (1) rejecting their injunctive relief claim on the first day of trial before hearing any evidence; (2) misattributing certain portions of a

report to their architecture expert; (3) preventing them from "using math" when testifying about their damages and declining to award them damages; (4) determining that they weren't prevailing parties for purposes of recouping their costs and attorney fees under the fee-shifting provision of the Colorado Common Interest Ownership Act (CCIOA), section 38-33.3-123(1)(c), C.R.S. 2024; and (5) dismissing their breach of fiduciary duty claim against the Association at the end of their case-in-chief. We address each contention in turn.

## II. Discussion

### A. Injunctive Relief Claim

¶ 10 The Pucas first contend that the court erred at the beginning of trial by rejecting their request for injunctive relief compelling the Petersons to move or modify their residence. According to the Pucas, the court's comments on the first day of trial reflect that it prematurely entered partial judgment denying their request for injunctive relief before hearing any evidence. The Pucas argue that the court incorrectly perceived itself as bound by the prior judge's ruling that partially denied their motion for a preliminary injunction.

¶ 11     At the outset, we note that the Petersons dispute preservation, arguing that the court took curative action after the Pucas raised their concern and the Pucas didn't object further. *See, e.g., Forgette v. People*, 2023 CO 4, ¶ 24 ("[W]hen a court takes curative action after a party brings an issue to the court's attention and the party fails to object or ask for further relief, any complaint that the court neglected to do more is unpreserved."). We need not decide whether the Pucas preserved this issue, however, because even if they did, we conclude that the court's comments don't require reversal. *See, e.g., In re Marriage of Mack*, 2022 CO 17, ¶ 12 (addressing petitioner's argument after assuming without deciding that he adequately preserved the issue).

¶ 12     Before testimony began on the first day of trial, the court made the following comments while addressing preliminary matters:

> I will also say — and I saw this and I was a bit alarmed to see it — if the Pucas are going to hang their hat on me ordering the Petersons to tear down and rebuild their house, y'all better start all over again, because I ain't going to do that.
>
> I am not going to order these people to tear down their home and rebuild it. I don't care if it cost a dollar. It is a waste. And I am also not going to do it — the main reason I'm not

5

going to do it is because about a year and a half ago Judge Stevens said, Finish your home, move in. That would be inconsistent with that court order. So I was very alarmed to see that in the Pucas' trial brief.

¶ 13     However, the court clarified its remarks the following day when the Pucas asked to make clear for the record that they had "not waived" their injunctive relief claim. The court said that, although the Pucas faced "an uphill battle" and it harbored reservations "at this point," it wasn't eliminating the possibility of granting the Pucas' request for injunctive relief. The court explained that it would "take a look" at the case law cited by the Pucas' attorney and that it intended to arrive at a "solution that follows the law," signaling that it remained open to granting the Pucas injunctive relief if doing so comported with the law and the evidence. Indeed, the court said that the Pucas' objection was "noted," not overruled, and it allowed the Pucas to present evidence regarding demolishing and rebuilding the Petersons' residence. The court also devoted four pages of its final order to the merits of the Pucas' injunctive relief claim.

¶ 14     In light of all this, we can't agree with the Pucas that the court improperly granted partial judgment to the Petersons at the

6

beginning of trial. *See Hoang v. Monterra Homes (Powderhorn) LLC*, 129 P.3d 1028, 1034 (Colo. App. 2005) (trial court didn't improperly prejudge insurance coverage issue, "[d]espite its early comments," where it allowed the garnishee insurance companies to present evidence in garnishment proceeding and considered the companies' evidence and legal arguments regarding coverage), *rev'd on other grounds sub nom. Hoang v. Assurance Co. of Am.*, 149 P.3d 798 (Colo. 2007).

¶ 15    For the same reasons, we also don't agree with the Pucas that the court improperly hewed to the prior judge's order partially denying the Pucas' motion for a preliminary injunction. We recognize, as the Pucas argue, that rulings denying requests for preliminary injunctive relief "for want of a clear and strong showing on the merits" generally "do not trigger law of the case consequences." *Governor's Ranch Pro. Ctr., Ltd. v. Mercy of Colo., Inc.*, 793 P.2d 648, 650 (Colo. App. 1990) (citation omitted). But the court didn't rely on the prior judge's findings or rulings from the preliminary injunction stage when resolving the Pucas' claims on the merits. Instead, the court independently made extensive findings of fact and conclusions of law on each of the Pucas' claims

7

(including their injunctive relief claim) based almost entirely on the evidence presented at trial.[1]  Nowhere in its final order did the court lean on the "law of the case" doctrine to short-circuit its analysis.

¶ 16    Accordingly, we reject the Pucas' contention that the court erred by entering partial judgment in the Petersons' favor on their injunctive relief claim before hearing the evidence.

### B.    Expert Misattribution

¶ 17    The Pucas next contend that the court erred in its final order by misattributing certain statements in a report to their architectural expert witness, Michael Fiebig, and confusing him with a different expert, Peter Thomas, a 3D rendering consultant hired by the Pucas who didn't testify at trial.  The Pucas assert that the court's misattribution "permeated large swaths" of its final order, caused the court to "devalue" Fiebig's opinions, and led the

---

[1] The court admittedly made one finding based in part on testimony from the preliminary injunction hearing — that the Petersons' residence fell within the designated building envelope and complied with the county's setback requirements.  But the court was permitted to rely on such testimony in its final order.  *See* C.R.C.P. 65(a)(2) ("[A]ny evidence received for a preliminary injunction which would be admissible upon a trial on the merits becomes part of the record on the trial and need not be repeated upon the trial."); *Governor's Ranch Pro. Ctr., Ltd. v. Mercy of Colo., Inc.*, 793 P.2d 648, 651 (Colo. App. 1990) (citing C.R.C.P. 65(a)(2)).

court to erroneously enter partial judgment in the Petersons' favor. We agree that the court inadvertently referred to the wrong expert in one sentence of its thirty-seven-page final order but conclude that the error was harmless.

¶ 18    In its analysis of the Pucas' injunctive relief claim, the court found that the change in the Pucas' mountain view was minimal. The court based its finding on the expert opinion of Kenneth Puncerelli, the Petersons' expert in landscape architecture and 3D renderings.  The court explained that it found Puncerelli's conclusions "persuasive" and that his composite diagrams were "particularly convincing."

¶ 19    The court also relied on Puncerelli's report to explain why, in contrast, it wasn't persuaded by the Pucas' expert.  The court said, "While the Court is not finding that *Mr. Fiebig* (the Pucas' expert) lacks credibility, the Court was not persuaded by *Mr. Fiebig*'s methodologies and portrayals given the issues and inconsistencies raised in pages 7 through 10 of Mr. Puncerelli's report."  (Emphasis added.)  All agree that the court mistakenly referred in this sentence to Fiebig rather than Thomas, the Pucas' 3D rendering consultant

whose renderings Puncerelli criticized on pages seven through ten of his report.

¶ 20    Nevertheless, we conclude that the court's misattribution was harmless.  *See* C.R.C.P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."); C.A.R. 35(c) (similar); *In re Parental Responsibilities Concerning E.E.L-T.*, 2024 COA 12, ¶ 30 ("An error affects a substantial right only if it substantially influenced the outcome of the case or impaired the basic fairness of the trial.").  Contrary to the Pucas' argument, the court's typographical error didn't "permeate" the rest of its final order.  Other than its misattribution noted above, the court mentioned Fiebig only twice in its lengthy final order — both times accurately.

¶ 21    First, the court said that it "reject[ed]" Fiebig's conclusion that the Petersons' residence was a two-story house.  Although the Pucas now acknowledge that the Petersons' residence is only one story, they nonetheless argue that Fiebig never testified that it was two stories.  But Fiebig's report, which the court admitted into evidence, said that the residence had two stories "above grade."

10

While the court didn't find that Fiebig lacked credibility, Fiebig's misstatement in his report provided the court with an independent basis for questioning the reliability of his opinions or, at minimum, giving them less weight compared to those of other experts. *See Owners Ins. Co. v. Dakota Station II Condo. Ass'n*, 2021 COA 114, ¶ 50 ("It's the trial court's sole province to resolve factual issues, determine witness credibility, weigh evidence, and make reasonable inferences from that evidence.").

¶ 22     Second, the court correctly cited to Fiebig's photographs as evidence showing that the residence and the barn appeared to have "an unbroken roof line," making the two buildings "look like one long structure." The Pucas don't take issue with the court's reliance on Fiebig's photographs for this purpose.

¶ 23     Given that the court's misattribution was isolated and didn't bleed into other parts of its final order, we can't say that the court's error substantially influenced the outcome of the case or impaired the basic fairness of the trial. *See E.E.L-T.*, ¶ 30; *see also Ortiz v. Colvin*, 298 F. Supp. 3d 581, 591 (W.D.N.Y. 2018) (administrative law judge's (ALJ's) misattribution of a medical opinion to the wrong medical professional didn't require a remand where the evidence

indicated the ALJ's evaluation "would not have changed had he credited the opinion to [the correct professional]").

## C. Damages

¶ 24 Next, the Pucas contend that the court erred by (1) preventing them from "using math" to quantify their alleged damages and (2) declining to award them damages. We disagree.

### 1. Standard of Review and Applicable Law

¶ 25 We review a trial court's exclusion of evidence for an abuse of discretion. *Williams v. Chrysler Ins. Co.*, 928 P.2d 1375, 1380 (Colo. App. 1996). A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or based on a misapprehension or misapplication of the law. *Far Horizons Farm, LLC v. Flying Dutchman Condo. Ass'n*, 2023 COA 99, ¶ 17.

¶ 26 In a bench trial, as in this case, it's the trial court's "sole province" to resolve disputed factual issues and to determine witnesses' credibility, the weight to accord testimony, and the inferences to be drawn from the evidence. *In re Estate of Owens*, 2017 COA 53, ¶ 22. The court isn't required to accept any witness's testimony, even if uncontroverted. *Id.* Similarly, the trial court in a bench trial has the sole prerogative to assess the amount of

damages, if any, and we will not set its decision aside absent manifest and clear error.  *See Lawry v. Palm*, 192 P.3d 550, 561 (Colo. App. 2008).

¶ 27    If a witness isn't testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  CRE 701; *see, e.g., Specialized Grading Enters., Inc. v. Goodland Constr., Inc.*, 181 P.3d 352, 357 (Colo. App. 2007).

¶ 28    In contrast, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."  CRE 702; *see, e.g., Hartman v. Cmty. Resp. Ctr., Inc.*, 87 P.3d 202, 205 (Colo. App. 2003).  "[T]he critical factor in distinguishing between lay and expert testimony is the basis for the witness's opinion."  *Venalonzo*

*v. People*, 2017 CO 9, ¶ 22. "If the witness provides testimony that could be expected to be based on an ordinary person's experiences or knowledge, then the witness is providing lay testimony." *Id.* at ¶ 23. But if the witness provides testimony that couldn't be offered "without specialized experiences, knowledge, or training, then the witness is offering expert testimony." *Id.*

### 2. Additional Background

¶ 29 During discovery, the Pucas produced the following table that they said reflected their estimated damages:

| Estimation of Damages | | | | |
|---|---|---|---|---|
| Loss of mountain view & sunsets for 40 days of summer forever | $500,000 | | | $500,000 |
| Privacy/light issues – Tree Screen | $70,000 | x2 due to loss, warranty, and water costs | | $140,000 |
| Diminution of Value | $50,000 | over 30 years @ 10% | $872,470 | |
| Diminution of Value | $50,000 | over 30 years @ 5% | $216,097 | |
| Diminution using real estate guidance | $400,000 | 50K doubling every decade for 30 years | $400,000 | |
| Average of Diminution | | | $496,189 | $496,189 |
| **Subtotal** | | | | **$1,136,189** |

¶ 30 Mr. Puca testified in his deposition that he consulted with two real estate agents to arrive at his estimates for the three figures for

diminution of value ranging between $216,097 and $872,470. He also relied on "real estate experts" whom he saw on television and an expert's "diminution-of-value" report. The Pucas, however, never disclosed the real estate agents or real estate experts as witnesses and they didn't testify at trial.

¶ 31 In response to the Association's motion in limine, the court ruled before trial that the Pucas could testify to their opinion of their property's value but that it wouldn't allow their testimony to cross the line into expert testimony under CRE 702. The court explained that, if "their reasoning . . . [is] going to start using math and numbers and CPA . . . estimates into the future based on a doubling every 30 years, that's not going to be permitted." In addition, the court ruled that the Pucas' estimated damages for the cost of building and maintaining the tree screen were based on hearsay and, in any event, an expert's testimony on the cost of maintaining a tree screen wouldn't be helpful to the fact finder.

¶ 32 At trial, without using complex mathematical formulas, the Pucas testified regarding their alleged damages that would result from losing their mountain view and sunsets ($500,000) and the cost of a tree screen ($140,000). The court ultimately declined to

15

award the Pucas damages, finding that their damages evidence wasn't persuasive.

### 3. Analysis

#### a. Exclusion of Damages Evidence

¶ 33 We agree with the Petersons that the court acted within its broad discretion when it ruled that the Pucas couldn't discuss complex mathematical formulas during their testimony on damages. Although straightforward mathematical calculations may fall within an ordinary person's experience and knowledge, *see Venalonzo*, ¶ 23, we can't say that all of the Pucas' mathematical formulas fit that mold.

¶ 34 Mr. Puca acknowledged in his deposition, for example, that his estimates for the diminution of his property's value relied on an expert's "diminution-of-value report," the experience of two real estate agents, "different interest rates," "present-value" calculations, and a general assumption that real estate is "expected to double every decade." Given the complex calculations involved and the sources of the underlying information, the court didn't abuse its discretion by concluding that a witness testifying on these topics would require "specialized experiences, knowledge, or training." *Id.*

at ¶ 2 (citing CRE 702); *see, e.g., Chicago Joe's Tea Room, LLC v. Vill. of Broadview*, 94 F.4th 588, 598 (7th Cir. 2024) ("Regardless of the validity of Donahue's assumptions about price-elasticity of demand, his estimate was not based on only the type of knowledge a layperson would have.  It required specialized knowledge excluded from Rule 701 testimony and should have been subject to the discovery rules and gatekeeping that apply to expert opinions.").

¶ 35    We aren't persuaded otherwise by the Pucas' argument that property owners are allowed to testify about their property's value.  The court made clear that the Pucas were permitted to testify regarding their opinion of their property's value.  *See Denver Urb. Renewal Auth. v. Hayutin*, 583 P.2d 296, 299-300 (Colo. App. 1978) (A property owner may state an opinion of the reasonable market value of the owner's property if it is not "based upon improper considerations.").  The court drew the line, however, at testimony requiring complex calculations that called for specialized experience, knowledge, or training.  The court's ruling wasn't an abuse of discretion.  *See James Rivers Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1219 (10th Cir. 2011) (applying Colorado law and holding that "landowner valuation testimony, if not based on

17

technical or specialized knowledge, may be admitted as lay opinion testimony").

¶ 36     The Pucas' opening brief is unclear as to whether they also challenge the court's pretrial ruling excluding their damages testimony related to their (1) lost mountain views and sunsets and (2) the cost of the tree screen. These two categories of damages admittedly involved less complex mathematical calculations than the Pucas' diminution of value estimates. To the extent they raise such challenges, we perceive no abuse of discretion by the court.

¶ 37     Notwithstanding the prior in limine ruling by a different judge, the court permitted the Pucas to testify at trial regarding both categories of damages. Mr. Puca testified, for example, about how he calculated his $500,000 estimate for the loss of their mountain views and sunsets. He said that they lost approximately 1,200 sunset views (forty sunsets a year for thirty years) and that he estimated the cost of a hotel room with a "panoramic sunset view" at $400 to $450 per night. Likewise, Ms. Puca testified regarding their $70,000 estimate for a tree screen and how they doubled it based on expected replacement costs over time.

18

¶ 38    Accordingly, the court didn't abuse its discretion by excluding those portions of the Pucas' damages testimony that involved complex mathematical formulas.

### b.    Declining to Award Damages

¶ 39    We also disagree with the Pucas that the court erred by declining to award them damages for their lost view across the horizon.  The Pucas argue that the court's stated reason — that damages for a lost view are too "subjective" — requires reversal because noneconomic damages are recoverable even when they are "inherently subjective."

¶ 40    Contrary to the Pucas' assertion, however, the subjective nature of the Pucas' requested damages wasn't the sole reason the court gave for declining to award the Pucas damages.  *See IBC Denver II, LLC v. City of Wheat Ridge*, 183 P.3d 714, 717-18 (Colo. App. 2008) (when a district court gives more than one reason for a decision, an appellant must challenge all those reasons).  The court also said that it "was not persuaded" by the Pucas' evidence regarding the loss of their property's value.  Specifically, the court explained that it wasn't persuaded by the Pucas' expert appraiser "given the number of variables."  Nor was the court persuaded by

19

Mr. Puca's testimony regarding what it would cost to "stay in a hotel to enjoy the sunsets."

¶ 41 As the fact finder, the court was free to accept or reject all or any part of any witness's testimony, even if uncontroverted. *See Owens*, ¶ 22; *Kim v. Grover C. Coors Tr.*, 179 P.3d 86, 96-97 (Colo. App. 2007). As an appellate court, we may not reweigh the evidence or substitute our judgment for that of the trial court. *Owens*, ¶ 22. Because we must defer to the court's assessment of the witnesses' credibility and the evidence's weight, we discern no clear or manifest error in the court's decision declining to award the Pucas damages. *See Lawry*, 192 P.3d at 561.

### D. Prevailing Party Status

¶ 42 The Pucas also contend that the court erred by determining that they weren't prevailing parties for purposes of recovering their costs and attorney fees under the CCIOA's fee-shifting provision, section 38-33.3-123(1)(c). We aren't persuaded.

¶ 43 We review a trial court's determination of which party prevailed in the litigation for an abuse of discretion. *Far Horizons Farm*, ¶ 17. We use this deferential standard because the trial court is best positioned to determine which party prevailed. *Lawry*,

192 P.3d at 570; *see also Archer v. Farmer Bros.*, 90 P.3d 228, 231 (Colo. 2004) ("A trial court is given broad discretion to determine who is a prevailing party in multiple claim cases because of its unique opportunity to observe the course of the litigation.").

¶ 44 With exceptions not relevant here, section 38-33.3-123(1)(c) states that the court "shall award" "reasonable attorney fees, actual costs, and actual costs of collection" to the "prevailing party" in a civil action to enforce or defend the CCIOA or an association's governing documents. As amended in 2006, the statute requires the trial court to determine the prevailing party in the action as a whole, not on a claim-by-claim basis. *Far Horizons Farm*, ¶ 29. In making this determination, the trial court should examine the case's overall context and consider where in the case the parties spent the majority of their time and resources. *See Reyher v. State Farm Mut. Auto. Ins. Co.*, 2012 COA 58, ¶ 37 (determining prevailing party status under C.R.C.P. 54(d)).

¶ 45 Although the court didn't cite section 38-33.3-123(1)(c) in its final order, the court found that neither party had achieved prevailing party status under C.R.C.P. 54(d). The court found that the Pucas devoted a "large portion" of their time at trial to their

claims associated with the Petersons' residence — claims that "met no success." As for the Petersons' barn, the court found that it awarded relief to the Pucas on only a "small fraction" of the violations they alleged. Based on the court's findings, which enjoy record support, we perceive no abuse of discretion in the court's decision declining to designate the Pucas as prevailing parties.

 E.    Dismissal of the Association's Breach of Fiduciary Duty Claim

¶ 46    Finally, the Pucas contend that the court erred by dismissing their breach of fiduciary duty claim against the Association under C.R.C.P. 41(b)(1) at the conclusion of the Pucas' case-in-chief.[2] The Pucas' argument is twofold: (1) the court applied an incorrect legal standard by evaluating the Association's actions under a reasonableness standard, rather than a higher fiduciary standard that demands good faith; and (2) the court erred by determining that the Association's six-month delay in issuing its notice of

---

[2] The Pucas' opening brief says that the court erred by dismissing "the Association during trial," without specifying which claims against the Association shouldn't have been dismissed. The substance of the Pucas' argument, however, focuses on their breach of fiduciary duty claim.

22

noncompliance didn't breach the Association's fiduciary duty to the Pucas.

### 1. Jurisdiction

¶ 47 As a threshold issue, the Association asserts that the Pucas' appeal of the court's order dismissing their claims against the Association is untimely under C.A.R. 4(a)(1), depriving this court of jurisdiction. According to the Association, C.A.R. 4(a)(1)'s forty-nine-day deadline for appealing the court's dismissal order began to run when the court dismissed the Pucas' claims against the Association in the middle of trial, not when the court entered its final written order months later. We don't agree.

¶ 48 Absent circumstances not present here, a final judgment is a prerequisite to appellate review. *See* C.A.R. 1(a); § 13-4-102(1), C.R.S. 2024. In general, a judgment is considered final if it disposes of the entire litigation on its merits, leaving nothing for the court to do but execute the judgment. *L.H.M. Corp., TCD v. Martinez,* 2021 CO 78, ¶ 14. In this case, the court's midtrial dismissal of the Pucas' claims against the Association didn't dispose of the entire litigation because the Pucas' claims against the Petersons remained unresolved. And as the Pucas point out, the

court didn't certify its midtrial dismissal order for immediate appeal under C.R.C.P. 54(b). Thus, the Pucas' notice of appeal, filed within forty-nine days of the court's final written order, was timely.

¶ 49 Having determined that we have jurisdiction over the portion of the Pucas' appeal involving the Association, we now proceed to address the Pucas' contentions.

### 2. Standard of Review and Applicable Law

¶ 50 Under C.R.C.P. 41(b)(1), after the plaintiff has finished presenting evidence in an action tried to the court without a jury, "the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." We will not disturb the court's ruling under this rule unless its findings and conclusions are so manifestly against the weight of the evidence as to compel a contrary result. *Gold Hill Dev. Co. v. TSG Ski & Golf, LLC*, 2015 COA 177, ¶ 45. However, we review the court's legal conclusions de novo. *In re Marriage of Morales*, 2024 COA 2, ¶ 11.

¶ 51 "A homeowners' association has a fiduciary duty to homeowners to enforce restrictive covenants." *Woodward v. Bd. of*

*Dirs. of Tamarron Ass'n of Condo. Owners*, 155 P.3d 621, 624 (Colo. App. 2007). In executing this duty, a homeowners' association's covenant enforcement "may require the exercise of discretion as to both the timing and the manner of enforcement." *Colo. Homes, Ltd. v. Loerch-Wilson*, 43 P.3d 718, 723 (Colo. App. 2001). The decision to enforce covenants must be made in good faith and must not be arbitrary, consistent with the business judgment rule. *See id.* at 724; *see also Woodward,* 155 P.3d at 624 ("A homeowners' association must use its authority to enforce protective covenants in good faith and in a reasonable manner."); *Rywalt v. Writer Corp.*, 526 P.2d 316, 317 (Colo. App. 1974) (applying the business judgment rule to a homeowners' association).

¶ 52     "Under the business judgment rule, '[t]he good faith acts of directors of profit or non-profit corporations which are within the powers of the corporation and within the exercise of an honest business judgment are valid.'" *Walker v. Women's Pro. Rodeo Ass'n,* 2021 COA 105M, ¶ 40 (citation omitted). At the same time, the business judgment rule doesn't shield the actions of directors who engage in fraud, self-dealing, unconscionability, or similar wrongful conduct. *Id.*

### 3. Additional Background

¶ 53    The Association approved the Petersons' request to build their residence and barn with certain variances from the governing documents, including height. When the Petersons began construction, however, the location of the structures didn't conform to the plans approved by the Association.

¶ 54    In November 2020, upon realizing that the structures would obstruct their mountain view, the Pucas sent a cease-and-desist letter to the Petersons and requested that the Association investigate. About a month later, with construction still proceeding and no investigation by the Association, the Pucas filed suit to attempt to halt the construction. The Association subsequently inspected the Petersons' property in January 2021 and issued a notice of noncompliance on April 21, 2021. The Petersons completed construction of their residence in August 2021.

¶ 55    At the close of the Pucas' case-in-chief, the court granted the Association's motion to dismiss under C.R.C.P. 41(b)(1). As for the Pucas' breach of fiduciary duty claim, the court determined that the Association hadn't violated its duty to enforce the community's restrictive covenants. The court found that the Association had

inspected the Petersons' property, determined their structures were noncompliant, and issued a notice of noncompliance. While the court noted the six-month delay between the Pucas' providing notice of the Petersons' violations and the Association's notice of noncompliance, it determined that the delay wasn't unreasonable.

### 4.    Analysis

#### a.    Legal Standard Governing the Pucas' Breach of Fiduciary Duty Claim

¶ 56    We conclude that the court didn't apply an incorrect "reasonableness" standard when it dismissed the Pucas' claims against the Association. In its oral dismissal order, the court recognized that the Association owed the Pucas a fiduciary duty, not a lower duty of mere reasonableness, explaining that "the [Association's] Board had a fiduciary duty to enforce the governing documents." Although the court also characterized the Association's delay in issuing its notice of noncompliance as "reasonable action," we don't perceive any inconsistency between that description and the governing legal standard. As *Woodward* explains, the fiduciary duty owed by a homeowners' association contains a reasonableness component, requiring that the

27

association "use its authority to enforce protective covenants in good faith and in a *reasonable* manner." 155 P.3d at 624 (emphasis added).

¶ 57 The Pucas nevertheless contend that the Association seeks to excuse its delay under the business judgment rule, which they say doesn't apply because the Association wasn't exercising any discretion when enforcing the governing documents. But a division of this court has held the opposite, explaining that "covenant enforcement may require the exercise of discretion as to both the timing and the manner of enforcement." *Colo. Homes Ltd.*, 43 P.3d at 723.

¶ 58 Accordingly, the court didn't apply an incorrect legal standard when dismissing the Pucas' breach of fiduciary duty claim.

b. The Association's Delay in Enforcement

¶ 59 We next address the Pucas' contention that the court erred by determining that the Association's six-month delay didn't breach its fiduciary duty. Whether a homeowners' association acted reasonably and in good faith in carrying out its fiduciary duty to enforce restrictive covenants is a factual question for the fact finder. *See Woodward*, 155 P.3d at 625.

28

¶ 60    In dismissing the Pucas' breach of fiduciary duty claim, the court made the following factual findings regarding the timing of the Association's enforcement actions:

- The governing documents don't set forth a timeline or deadlines for the Association to respond to complaints by homeowners regarding violations by other homeowners.

- After receiving the Pucas' concerns in early November 2020, the Association's board discussed the issues involving the Petersons' structures at its annual meeting in late November. The board decided to contact its general counsel, which caused some delay in the Association's response to the Pucas.

- The Pucas filed their lawsuit on December 3, 2020. At that point, the Association decided to involve its "litigation counsel," which "added to the time needed to respond."

- External factors, such as the Association board members' travel for the holidays in late 2020 and the COVID-19 pandemic, made it difficult for the board to meet to discuss the Association's response to the Pucas.

- The Association inspected the Petersons' property on January 25, 2021. The Association's board voted "a couple of weeks" later that the Petersons' structures were noncompliant.

- The Association's staff experienced "some confusion" over whether the Association's counsel or its staff would send the notice of noncompliance to the Petersons, leading to some delay.

- The Association's initial notice of noncompliance was returned because the only address the Association had on file for the Petersons was their unoccupied and unfinished residence in the community. The Association reissued the notice on April 21, 2021.

- Section 5.9 of the declaration requires the Association to issue a notice of noncompliance for any noncompliant improvements within sixty days of receiving a notice of completion. That deadline hadn't been triggered when the Association issued its April 21, 2021, notice of noncompliance because the Petersons hadn't yet completed construction.

¶ 61　　Because the court's findings are supported by the record, they aren't "so manifestly against the weight of evidence as to compel a contrary result." *Gold Hill Dev. Co.*, ¶ 45 (citation omitted).

¶ 62　　To the extent the Pucas argue that, even accepting the court's factual findings, the court committed legal error by concluding that the Association didn't breach its fiduciary duty, we disagree. None of the court's findings reveal fraud, self-dealing, unconscionability, or similar misconduct that would authorize a court to interfere with or regulate the conduct of the Association's board of directors. *See Walker*, ¶ 40. To the contrary, the Association's board met within a matter of weeks of receiving notice of the Pucas' concerns, appropriately sought legal counsel when sued, inspected the Petersons' property, and issued a notice of noncompliance. The Pucas cite no authority, and we've located none, indicating that taking six months to accomplish these tasks amounts to a breach of a homeowners' association's fiduciary duty. *Cf. Beaver Lake Ass'n v. Sorensen*, 434 N.W.2d 703, 706 (Neb. 1989) (homeowners' association's eight-month delay in bringing suit to enforce restrictive covenant after completion of construction wasn't unreasonable); *City of Houston v. Muse*, 788 S.W.2d 419, 422 (Tex.

31

App. 1990) (city's ten-month delay in bringing suit to enforce restrictive covenant after learning of the violation wasn't unreasonable).

¶ 63    Accordingly, the court didn't err by dismissing the Pucas' breach of fiduciary duty claim against the Association.

F.    Request for Appellate Attorney Fees and Costs

¶ 64    The Petersons and the Association each request an award of their reasonable attorney fees and costs incurred on appeal under section 38-33.3-123(1)(c).  Because we have rejected the Pucas' arguments and affirm the judgment, we grant the Petersons' and the Association's requests.  *See Far Horizons Farm,* ¶ 39 (awarding appellate attorney fees to the prevailing party on appeal under section 38-33.3-123(1)(c)).  We exercise our discretion under C.A.R. 39.1 to remand the case to the trial court to determine the reasonable amount of those fees and costs.

¶ 65    We deny the Pucas' request for attorney fees.

III.    Disposition

¶ 66    We affirm the judgment, and we remand the case to the trial court for further proceedings consistent with this opinion.

JUDGE J. JONES and JUDGE LIPINSKY concur.